## JOSEPH C. BARKER v. STATE.

No. A-5351.   Opinion Filed Dec. 23, 1925.
(242 Pac. 274.)

J. H. Price, for plaintiff in error.

The Attorney General and Smith C. Matson, Asst. Atty. Gen., for the State.

BESSEY, P. J. The plaintiff in error, Joseph C. Barker, for convenience referred to herein as the defendant, was convicted of manslaughter in the first degree, for the killing of his infant son, Artemus Barker, aged about 2 years. By verdict of the jury, his punishment was fixed at confinement in the penitentiary for a term of 8 years.

The defendant and his family lived in three tents at the Legion Park on the outskirts of Watonga. This little child had been frequently chastised severely by the father. In the early summer of 1924 it was observed that this child was no longer at or about the tent home of the family, and investigation confirmed the suspicion that the child had been the victim of foul play. Finally the county attorney and the sheriff went to the defendant's tents to make further inquiry concerning the child's disappearance. Concerning this visit the sheriff testified in part as follows:

"Q. What did you, or what did any of you do, after getting out there? A. Well, when we got out there, we drove out there in the car, and when we got out there we stopped the car about 8 or 10 steps from where their tents were, and Mr. Barker met us there and wanted to know what our business was, what we wanted out there.

"Q. Just go ahead and tell. A. The county attorney talked with him there a few minutes, tried to talk to him, and he insisted that we leave, and finally Mrs. Barker got

up from where she was eating in one tent and came to the door with a shotgun and insisted that we leave, and to do it right then. Mr. Barker stood around there with his right hand in his pants pocket and he was insisting that we get out of there and go right then."

After some further argument, the county attorney and the sheriff left the park and procured a warrant for the arrest of the defendant, his wife, and a kinsman who lived there with them. The county attorney, the sheriff, the jailor, and the manager of the park all went to the tents of the defendant to arrest the parties named. Concerning this second visit, the sheriff, corroborated by the others, testified:

"A. I met Mr. Barker there, and he wanted to know what we wanted now, this time, and I says, 'I have a warrant for you,' and I offered to read the warrant to him, and he wouldn't listen to me, and he still had his right hand in his pocket, and at that time Mrs. Barker came out from the tent and started back to that tent where she got the shotgun the first time, and I didn't pay much more attention to Mrs. Barker after that.

"Q. What did you do then? A. I beat her to the shotgun.

"Q. Did you have any trouble getting possession of the shotgun? A. Yes, sir; Mrs. Barker and the girls were all in the tent where the shotgun was, and there was a six-shooter and a shotgun lying on the bed, and the ammunition was spread out there on the bed for both guns, and I had a six-shooter in my hand, and when I got there I had another six-shooter and a shotgun, and I had my hands full, and they was trying to take that shotgun away from me, and we wrestled around quite a little bit.

\*    \*    \*    \*    .\*    \*    \*    \*

"A. I saw the county attorney had hold of Mr. Barker's wrists, and the undersheriff was taking an automatic pistol out of his hand."

As will be seen from the above testimony, and as appears from that of other witnesses, there were several guns

there, of various kinds, all loaded, and plenty of extra ammunition on the bed ready for use.

The defendant and his wife and his kinsman were taken by the officers and lodged in jail on a charge of murder.

Lillian Barker, aged 6 1-2 years, Alma Barker, aged 12, and Naomi Barker, aged 10, all sisters of the child Artemus, all testified that their little brother was dead. The youngest, Lillian, testified in effect that the child's death was due to a blow on the back of his head, administered by the father with a wooden club. The other sisters did not see the fatal blow struck, and could not of their own knowledge state the cause of the child's death, except that they said he had a wound on the back of his head, and that after he was dead he was dressed in a little white shroud and taken away secretly at night.

The only assignment of error which raises a question worthy of serious consideration is whether the child witness, Lillian Barker, was competent; whether the facts related by her were worthy of credence.

Regarding the competency of various classes of witnesses, section 589, Comp. Stat. 1921, provides as follows:

"The following persons will be incompetent to testify:

\* \* \* \* \* \* \* \*

"Second. Children under ten years of age who appear incapable of receiving just impressions of the facts respecting which they are examined, or of relating them truly."

In the case of Walker v. State, 12 Okla. Cr. 179, 153 P. 209, this court said:

"When objection is made to a witness, on the ground of incompetency by reason of nonage, the competency of the witness is a mixed question of law and fact, to be determined by the trial court upon an examination of the witness, and only a manifest abuse of judicial discretion in de-

ciding that a child is competent to testify will warrant interference with such decision on appeal. * * * Intelligence and not age is the proper test by which the competency of a child as a witness must be determined, and, where it appears that a child witness had sufficient intelligence to receive just impressions of the facts respecting which she is to testify, and the capacity to relate them truly, and has received sufficient instruction to appreciate the difference between right and wrong, and a proper consciousness of the punishment of false swearing, an objection on the ground of incapacity and incompetency was properly overruled."

In Darnell v. State, 14 Okla. Cr. 540, 174 P. 290, 1 A. L. R. 638, it was said:

"The question of the competency of a witness under 10 years of age is a matter addressed peculiarly to the discretion of the trial court."

The substance of what has been said in the foregoing cases was reiterated in Collins v. State, 15 Okla. Cr. 96, 175 P. 124, and again in a late decision of this court, Rutledge v. State, 32 Okla. Cr. 396, 241 P. 351.

This child was quite young. Many children of her age might not be able to qualify as witnesses, but the trial court in this instance took great pains to inquire into her intelligence and powers of understanding, as well as her comprehension of right and wrong and the penalties for testifying falsely. She was able to read in the sixth reader. She had read extensively from the Bible, and read portions of it in open court. She stated that she knew it was wrong to testify falsely, and that she could be put in jail if she told a falsehood in court. She believed in future rewards and punishments. Her recital of the facts appeared as consistent and intelligent as some narratives coming from witnesses of mature age. Portions of her testimony were a little obscure, but some of these points might have been clarified by further examination.

It is often difficult to determine the alertness of per-

ception or the reliability of the memory of a witness from the mere language of the record. What the witness actually meant and how well she knew whereof she told could be better understood from observing the manner of her physical and vocal expressions, and her general demeanor as a witness. All things considered, we cannot say that the trial court abused his discretion in permitting her testimony to go to the jury.

The conduct of the defendant and his wife in objecting to and resisting an investigation of the child's absence, and their resistance of arrest, are indicative of misconduct of some character, and consistent with the theory of the state that the child was killed by his father, as outlined by his little girls.

The officers of the law in this case exercised extraordinary forbearance and discretion in handling a dangerous situation, and for this they should receive the highest praise.

While the defendant was within his rights in refraining from going on the witness stand and explaining this unusual state of affairs, yet the fact that no explanations were made by those persons who could have cleared up the mystery in all of its details may be considered here as tending to corroborate the state's testimony.

The judgment of the trial court is affirmed.

DOYLE, J., concurs.

EDWARDS, J., does not participate, having certified his disqualification.