# HARRIS v. STATE.

No. A-11786. Oct. 7, 1953.

(261 P. 2d 909.)

Harold McArthur, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Sam H. Lattimore, Asst. Atty. Gen., Lewis J. Bicking, County Atty. Tulsa County, Tulsa, for defendant in error.

POWELL, P. J.  Theodore Harris has appealed from a conviction in the district court of Tulsa county of the murder of his common-law wife, Princella. The jury assessed a penalty of life imprisonment in the State Penitentiary.

For reversal two specifications of error are assigned:

"1. Admission of incompetent evidence, to-wit: the testimony of Kenneth Washington, a five-year old witness, on behalf of the State.

"2. That the evidence is wholly insufficient to sustain a conviction."

The two specifications will be treated after a consideration of the evidence heard at the trial.

Goldman Hopkins testified that he lived at 545 East Cameron Street, Tulsa; that he was acquainted with the defendant Theodore Harris, who lived at 543 East Cameron, which was 25 or 30 feet east of his house and on the same side of the street.  Witness further testified that on the 9th day of August, 1951, he was walking on the sidewalk by defendant's place and he heard some kind of noise in defendant's place and witness stopped about four minutes and listened, and heard a rumbling noise, and then witness went on to his home and ate supper and

then went back out on the porch, and he heard the defendant Harris "cussing, out in the street"; that defendant said: "If any of you sons-of-bitches call the law, you can't live on Cameron Street."

On cross-examination Hopkins testified that the defendant left home, walking down the street; that he saw Princella standing in the doorway with a white tape across her face. He was asked if "she stood there normally as she would if nothing had been going on" and witness answered: "That is all I saw. I couldn't tell by looking at her." He stated that he never saw her alive after that.

Mary Washington testified that she lived at 545 East Cameron and knew the defendant. She further testified that she was familiar with his voice and that on August 9, 1951, she was sitting on her front porch and heard the defendant beating his wife Princella. She stated that she lived across the alley from the defendant, close enough to stand on her porch and talk to them. She further testified as follows:

"Q. Did you hear any other voices in the house? A. I didn't hear nobody but him and I heard him cussing her. Q. What did he say? A. He told her to get out. He said, 'God dam you, I will kill you if you don't get out. I told you to move and if you don't move, the undertaker will come and get you and take you out.' Q. Did you hear that while you were still on your porch? A. I was off the porch and walked down to the alley."

Witness stated that defendant soon came out of the house onto Cameron street; that a number of persons had stopped out in front. She was further asked and answered questions as follows:

"Q. What else did he say, if anything? A. He said, 'Yes, God dam it, I beat her, and if some of you sons-of-bitches call the law, then you all cannot live on Cameron Street any more,' and by that time Wise Taylor walked up and he said, 'Yes, God dam it, that goes for you too." Q. Did Wise Taylor live in that neighborhood? A. Yes, sir. Right at the corner, 531 East Cameron. Q. About what time in the evening was this? A. Between six-thirty and seven because my roomers had been coming from work. Q. Did he make any other threats towards any of you standing out there other than you all could not live on Cameron Street? A. That is the only threat that he made except what he said to Wise. He said, 'Yes, you snitchy son-of-a-bitch, if you call the law, you can't live down on that corner any more.' "

On cross-examination witness stated that she had lived in the neighborhood about eleven years; was married; that her husband worked at the Mayo Hotel. She stated that the morning after defendant beat his wife and being Friday morning, she saw the defendant come out of the back of the house twice and go to the burner in the rear; that this was around 8:30 or 9 o'clock; that she saw him no more after that until Princella was found in the house dead. Witness admitted that she had gone to defendant's home on two occasions to get her husband who was purchasing whiskey by the drink from the defendant, but she denied being mad at the defendant. Witness stated on redirect examination that about two weeks prior to the last trouble, she had heard defendant's wife screaming and defendant had beat up his wife so badly that she was taken to the hospital and defendant to jail, but that the officers soon released defendant and he and Princella came home. She stated that she had seen defendant slap his wife.

Sarah Barnett testified that she lived next door to the defendant and at 541 East Cameron, next to the alley; that on Thursday, August 9, 1951 she heard defendant cursing and walking up and down the street in front of his house and swearing at his neighbors; that he said: "Call the law"; that anyone could call the law, that he had beat her. She repeated the vile language that she said he used. She denied being mad at defendant and denied that she sold whiskey, but stated that some time in the past she had sold whiskey.

Dr. Harold Beddoe testified that he examined the body of Princella Johnson at about 9:30 on the 11th day of August, 1951, at 543 East Cameron, and about an hour later at the funeral home. He stated this was Friday, but the 11th was Saturday. He testified as follows, on direct examination:

"Q. Doctor, what did you find when you examined Princella Johnson? A. The body bore the following marks: On the right side of the face opposite the outer edge of the right eye and one-half inch from the edge, there was a cut about three-eighths of an inch long. Over the left eyebrow, there was a cut about one inch long. Q. About how wide were these cuts, if they were wide? A. Just the normal width that the skin relaxes to when it is cut by some object. They were from one-eighth of an inch in the center of the cuts to nothing at the ends. On the right cheek, there were several horizontal scratches and on the bridge of the nose there was a scratch and the left shoulder and the arm pit, there were bruises that appeared to have been produced by a hand with the thumb in the arm pit and the fingers resting up on the shoulder. Extending down the left arm, was a large bruised area and on the left forearm and hand were other extensive bruises. On the back of the left forearm, about four inches up from the wrist, there was a round abrasion or scraped place about a quarter of an inch in diameter. There was a small deep scratch on the back of the first section of the middle finger on the left hand. And there was a scratch on the back of the left hand at the base of the left ring finger. There was also a so-called brush burn, or abrasion, back of the left shoulder about three inches long and about one inch wide. Q. About one inch wide and about three inches long? A. Yes, sir, that is right. Q. What appeared to have made that brush burn? A. That could have been produced by rubbing against any hard surface, such as a plastered wall or cement floor. Q. Did you observe the surroundings there at that time? A. Yes, sir. Q. What did you find immediately surrounding this victim? A. With reference to the physical condition of the building? Q. Yes. A. Well, the floor, I believe, was concrete and I am not sure about the walls. Q. What did you find in the way of furniture and so forth, around there? A. There was a bed in the southeast corner of this particular room and a table between where the subject was and the northwest corner was a bed and the southeast corner and about two or three feet south of where she was found, there was a gas heater. A stove. *And on top of this stove was an ordinary claw hammer; a carpenter's hammer* and there was a basket of clothing on a chair, between her and the stove, and on another chair was a basket of clothing beyond the stove. (Emphasis supplied.) Q. Now, with reference to this brush mark on her back, could this claw hammer have been used in making that brush mark or burned mark, or whatever you call it? A. Yes, that could have been. Yes, it was more likely because of the blow on the right eye and over the left eyebrow because of the nature of those cuts, they apparently had been inflicted by some rounded surface, such as the face of a hammer. Q. You testified there were cuts to each eye? A. Yes, sir. Q. Did you find any other bruises or scratches? A. Yes, sir. Q. Basing your opinion on what you found there, what was the cause of her death? A. The cause of death could have been head injuries from the blows on the head. In other words, injuries to the brain from the blows about the head. Q. About what time of day or night were you out there? You told me but I forgot. A. About 9:30 in the morning. Q. Do you have an opinion about how long it was prior to that time this person died? A. My opinion was that death probably occurred some where from five to ten hours before the time I examined the body. I examined the body at 9:30. Q. That was 9:30 Friday morning? A. Yes, sir. Q. That you were out there? A. Yes, sir. Q. Then that would put her death back as of somewhere around midnight on Thursday night? Is that right? A. Between five and ten hours. Q. Somewhere between midnight then and four or five or six o'clock Friday morning? A. That is right. Q. In your opinion, this death was apparently due to blows on the head? A. I would say that it could have been, yes, sir."

On cross-examination, this witness testified:

"Q. Doctor, you testified there was a cut over the right eye about three-eighths of an inch deep. Is that what you said? A. I believe I said long. Q. Three-eighths

of an inch long? A. Yes. Q. How deep was it? A. Down to the bone. Q. Was the bone shattered in any way? A. I could not determine from my particular investigation. Q. Unless the bone was shattered, that would not cause death, would it? A. It could. Yes, sir."

This witness stated on cross-examination that the hammer blows could cause death without shattering the bone. He further stated that it was very difficult to estimate the time of death. Asked if the wounds were inflicted just prior to her death, he said: "Not necessarily so. There was no blood around on the skin that one would normally expect to find from such wounds and the degree of development of the bruises indicated that probably,—I don't know how many hours,—*a few hours elapsed from the time that she received them until the time of her death.*" (Emphasis supplied.) It was the opinion of the witness that the bruises and cuts all came at the same time.

Sam Shepherd testified that he was identification officer for the Tulsa Police Department and was such on August 9, 1951, and that he worked on the Theodore Harris case. He identified eight pictures, seven being taken at 543 East Cameron on August 11, and one at the Jackson Funeral Home. One was identified showing a woman in a kneeling position bending over a box of clothing or bedding. It also shows a round faced claw hammer nearby, lying on top of a stove. Witness stated the woman was dead. He further stated that a laboratory test showed that there was a fragment of a fingerprint on the hammer handle apparently of blood, and two and a half inches away from the head of the hammer. He identified the clothing worn by the woman at the time he made the picture and identified the claw hammer. He stated there was blood all over the dead woman and on the sheets.

The state offered the evidence of Kenneth Washington, son of Princella Johnson, deceased, and after the court questioned him at some length he decided that the witness, though but five years of age, was qualified to testify, to which the defense objected and excepted.

Witness stated that he was five years of age, that he knew that because his mother told him so; that the devil would get little boys who did not tell the truth; that if he testified that he would tell the truth. He said that he did not go to school; he did not know his birthday, that since his mother had died and was buried in a deep hole that he had lived with his aunt Hazel. He stated that he knew Theodore Harris, that he lived with witness and his mother. The child testified on direct examination:

"Q. Now just speak out. Now, at the time you and your mother and Theodore Harris were all living together there, did your mother and Theodore have any trouble; any quarrels, or anything? A. Yes. Q. They did? A. Yes. Q. What happened there? A. He hit her in the head with a hammer. Q. What else did he do, if anything? A. He kicked her in the face. Q. Kicked her in the face? A. Yes. Q. What were you doing when they were doing that? A. I was in bed asleep. Q. You were in the bed asleep? A. Yes. Q. What woke you up? A. Theodore knocked my mother over on the bed and woke me up. Q. Your daddy, Theodore Harris, knocked your mother over on the bed and woke you up? A. Yes."

On cross-examination the witness denied that anyone had told him how his mother "got down in the deep hole." He repeated that he was asleep when the scuffle between Theodore Harris and his mother commenced, but he was awakened and that Theodore Harris hit her with a hammer. He was asked, "Did you hear your mother say anything afterwards? A. She wasn't doing anything then but hollering." He stated that after this his mother did not fix him any meals, that she did not go any place, and that he was still in bed. He was asked who told him it was a hammer with which his mother was hit, and he answered, "I just

saw the hammer", and stated that Theodore hit his mother "in the head" with it, and that his mother did not have "nothing" in her hand at the time.

On re-direct examination the child identified the hammer, State's Exhibit 9, and his mother's clothing, State's Exhibits 10 and 11.

The state next called Dr. Palik, who was subpoenaed and who had performed an autopsy on the deceased person, but it developed that he had left the state and the court refused a continuance of the case until he would return.

The state then rested, and the defense interposed a demurrer, which was by the court overruled.

The first witness for the defense was Tinnie Webb, who stated that the defendant was her "boy friend", and that he sometimes spent the night with her and sometimes would stay two nights in a row; that she lived at 318 East Haskell Street, Tulsa, and that on Thursday night, August 9, 1951, he arrived there about 9 or 10 o'clock and left early the next morning, which was Friday, but came back about noon and stayed until Saturday morning; that her daughter Irene Nolen 'phoned her to tell her that Princella Johnson had been found dead. She said: "I was so shocked, I didn't say anything for a while and I spoke to him and he didn't say anything." Witness said that defendant then left her house. She was asked: "Did he leave immediately?" and she answered: "He sure did", but she stated that she did not know where he went.

Irene Nolen testified that she had known the defendant about two years and that he had been staying with her mother off and on; that she saw him at her home Thursday morning, August 9, and that he came to their house Thursday night; that she was asleep when he left Friday morning, but he came back about noon and stayed until Saturday morning. That witness was down on Archer Street Saturday morning and heard of Princella Johnson's death and she then 'phoned her mother and asked her mother if Theodore Harris was there.

J. P. Mack testified that he lived at 543 East Cameron, that Princella Johnson and Theodore Harris rented the apartment from him, which was on the ground floor, east side of the house; that Princella had sold him whiskey, that on Saturday, August 11, Theodore Harris came by his place crying; that he last saw defendant prior to that on Thursday night at about 8:30 at his home and Princella was there; that he stayed there about an hour and then left; that witness had been drinking; he stated: "I wasn't sober, I had taken several drinks." He said that he was somewhere between sober and tight. Witness was asked: "Now at that time was any trouble going on there?" He answered: "Not at that time." Witness stated that there were no bruises on Princella's face and hands at that time. Witness stated that he walked up the street to his home and did not see any people in the street and did not hear any commotion thereafter. Witness was very evasive in answering questions on cross-examination.

The defendant Theodore Harris testified that he had lived in Tulsa since 1909, that he got to the sixth grade in school; that he had been employed in construction work and at the Douglas plant; that he had lived with Princella Johnson since in 1949 at 543 East Cameron; that he also would stay with Tinnie Webb about three nights a week at her home; that she was his girl friend; that he and Princella sold whiskey by the drink at their house; that two or three of his neighbors also sold whiskey, and named Sarah Barnett and Mary Washington. Witness admitted that he had served a year and a day in the penitentiary and five months and fifteen days in the Tulsa county jail. He claimed that Sarah Barnett had slammed the door in his face and had told him to stay away from her house, and that Mary Washington had come to his house to get her husband who was having a drink, and had "raised cain" with witness because her husband

was there drinking. Witness admitted that he was home at about 6:30 on Thursday, August 9, and that J. P. Mack was there and they were all drinking, but that defendant left about 8:30 and went to Tinnie Webb's; that he got there at 9 or 9:30 and left the next morning about 8 and "went down on the street, come back at noon, stayed until Saturday morning when Tinnie's daughter 'phoned that Princella had been found dead"; that he went over there Saturday morning, but the door was locked. Defendant then gave himself up.

Witness stated that when he left home Thursday night Princella had on a kind of old rose dress, claimed she did not have on the clothes introduced in evidence. He admitted owning the hammer and claimed that it was in his toolbox when he left. Witness denied beating his wife and denied seeing people in the street in front of his house and denied cursing thm. He claimed that it had been about two months since he and his common-law wife had had any trouble, that he only slapped her then. He claimed that he last saw his wife alive on Thursday night.

Defendant admitted that there were other persons in his house Thursday evening when J. P. Mack was there and he and Princella were there, to-wit: "Ray Smith, a boy called George, and another fellow named Sargo". He stated that he did not tell the police officers that they were there Friday morning as shown in a signed statement given to the officers soon after his arrest. Defendant admitted that he had been convicted of forgery, second-degree burglary, pointing a deadly weapon and escape from the penitentiary at McAlester.

In rebuttal the state produced Wise Taylor who testified that he was acquainted with the defendant Harris, and knew Princella Johnson prior to her death, that on Thursday, August 9, 1951 witness was walking by their place just before dark and noticed a disturbance, and saw Theodore Harris. Witness was asked:

"What was he doing or saying? A. He walked out on the street and shut the door and a bunch of them were sitting around there and he asked them who in the hell didn't like it and he said, 'Some of you sons-of-bitches can go tell that, if you like'. I was passing on by and he said, 'That goes for you too, if you want to run up there and tell something. If you don't like it, that goes for you too. All you sons-of-bitches, that goes for all of you.' "

Witness further stated that Harris acted like he was "half drunk"; that there were several people up and down the street at the time there on East Cameron by defendant's place. He said a number of them by the way they talked seemed to have been drinking, and said, "I just went on." He stated that Sarah Barnett was standing in her door and that Mary Washington was sitting on her porch, and were not in the group that he had indicated were apparently drinking.

J. H. Smitherman, police officer, testified that on Saturday morning, August 11, 1951, he went to Princella Johnson's home, found "the body of the deceased in a semi-kneeling position, adjacent to the back door with her face down on a basket of clothing; of dirty clothing, dead." He stated that the picture in evidence fairly depicted the deceased and the room at the time he investigated the death the morning of Saturday, August 11, 1951. He stated that after making the investigation he returned to police headquarters, and interrogated the defendant, and took down on the typewriter answers to questions propounded, and thereafter defendant read the statement and signed it in the presence of several witnesses. The defendant was advised of his constitutional rights. Defense counsel did not object to the introduction of the statement in evidence. Defendant was asked:

"When did you last see your common-law wife, Princella Johnson, alive? A. Yesterday [Friday] morning about eleven o'clock. Q. Where did you see her alive? A. She was sitting on the side of the bed in our home. Q. What was her

physical condition at that time? A. She was well and hardy. Q. Did you and your wife quarrel yesterday when you last saw her when alive? A. No, sir."

He stated that Princella knew of his affair with Tinnie Webb, but they had not quarrelled about it. Defendant was further asked:

"Who was present in your home, if anyone, when you left there about 11 o'clock yesterday [Friday] morning? A. Ray Smith, J. B. Mack, a boy called George, and another fellow named Sargo."

Thus the case closed.

From the above it is evident that there was sufficient circumstantial evidence, if believed by the jury, to have supported the conviction. The court gave a correct instruction covering circumstantial evidence. But the jury did assess life imprisonment, and that no doubt was greatly influenced by the testimony of Princella's five year old boy. Defendant claims that such testimony was incompetent due to the tender age of the witness.

The Attorney General insists that the rule governing the question has been stated by this court in Walker v. State, 12 Okla. Cr. 179, 153 P. 209, where we said, in paragraph one of the syllabus:

"When objection is made to a witness, on the ground of incompetency by reason of nonage, the competency of the witness is a mixed question of law and fact, to be determined by the trial court upon an examination of the witness, and only a manifest abuse of judicial discretion in deciding that a child is competent to testify, will warrant interference with such decision on appeal."

See, also, Rutledge v. State, 32 Okla. Cr. 396, 241 P. 351; Barker v. State (involving testimony of a six and a half year old child), 33 Okla. Cr. 25, 242 P. 274; People v. Delaney, 52 Cal. App. 765, 199 P. 896.

In the recent case of Rawls v. State, 93 Okla. Cr. 219, 226 P. 2d 984, 985, we said, in paragraphs 3 and 4 of the syllabus:

"Under statute specifying what witnesses may testify, competency of a child is to be determined by degree of understanding that it appears to possess, and not by its age.

"There is no precise age at which children are excluded from giving evidence, but, generally, the child should appear capable of distinguishing between good and evil, and should have just appreciation of difference between right and wrong, and a proper consciousness of the punishment for false swearing."

The trial judge had the five year old child before him, he asked him preliminary questions. He was afforded the opportunity of not only listening to his answers, but of observing his appearance and manner. The manner of answering questions would have a great bearing. The determination of the competency of the child to testify was peculiarly within the trial court's discretion, and his ruling thereon will not be reversed unless we can determine that there was a clear abuse of discretion. We have literally set out the evidence of the child, as of other witnesses, which on the face demonstrates that the child never wavered in his testimony as to how his mother came to receive the hammer blows on her face and skull. The fact that he did not know the day of the week or display a ready knowledge of matters in general would not nullify his testimony of specific matters observed by him and from which defense counsel was unable to get him to deviate.

We conclude then that the evidence of Kenneth Washington was competent and that the trial court did not err in permitting the jury to consider the same.

From the evidence that we have quoted verbatim, and from that summarized, it will have been noticed that the state failed to show just how and when it was first learned that Princella Johnson was dead; whether some neighbor called or the cries of the child attracted the attention of someone. The fact remains that there was overwhelming competent evidence that the defendant had been drinking Thursday evening, August 9, 1951, and had beaten his wife and threatened to kill her. It is significant that he denied all this in the face of the evidence against him. He admitted leaving to stay with a second mistress, and though he denied returning Friday morning, one witness testified to seeing him make two trips to the "burner" in the rear of the home on Friday morning. Also, the defendant in his statement to the officers after arrest Saturday morning stated that the last time he saw his wife Princella alive was Friday morning, and that she was sitting on the side of their bed. The question was so repeated that there would not appear to have been occasion for misunderstanding. The defendant when he testified denied making such a statement, though he was shown to have read it and then affixed his signature. He admitted to having been convicted of crimes that no doubt in the eyes of the jury entered into causing them not to give too great weight to his explanations and denials, in the face of the circumstances, the testimony of his neighbors, and the positive evidence of the little boy that defendant hit his mother on the face and head with the claw hammer, which he identified. All these circumstances were matters and things for the jury to ponder over in reaching their ultimate conclusion of the guilt or innocence of the defendant.

We have consistently held that where there is ample competent evidence to sustain the conviction this court will not weigh the evidence nor determine the credibility of the evidence of witnesses as those are matters within the province of the jury. Ray v. State, 96 Okla. Cr. 89, 249 P. 2d 135; Lane v. State, 91 Okla. Cr. 107, 216 P. 2d 353; Griffin v. State, 79 Okla. Cr. 85, 151 P. 2d 812; Taylor v. State, 95 Okla. Cr. 98, 240 P. 2d 803; Brumley v. State, 96 Okla. Cr. 97, 249 P. 2d 471.

By reason of the above, the judgment of the district court of Tulsa County is affirmed.

JONES and BRETT, JJ., concur.