2006 OK CR 50

**Dallas Jay SEABOLT, Appellant**

v.

**STATE of Oklahoma, Appellee.**

**No. F–2004–1005.**

Court of Criminal Appeals of Oklahoma.

Dec. 15, 2006.

Roger Hilfiger, Attorney at Law, Muskogee, OK, attorney for appellant at trial.

James Walters, Asst. District Attorney, Muskogee, OK, attorneys for the state at trial.

Ricki J. Walterscheid, Appellate Defense Counsel, Norman, OK, attorney for appellant on appeal.

W.A. Drew Edmondson, Attorney General of Oklahoma, Jennifer B. Miller, Asst. Attorney General, Oklahoma City, OK, attorneys for appellee on appeal.

## *OPINION*

A. JOHNSON, Judge.

¶ 1 Dallas Jay Seabolt was tried by jury in the District Court of Muskogee County, Case No. CF–2004–179, and convicted of Possession of a Controlled Dangerous Substance with Intent to Manufacture, After Former Conviction of Two or More Felonies in violation of 63 O.S.Supp.2003, § 2–401(G). The jury fixed punishment at 45 years imprisonment. The Honorable Thomas H. Alford sentenced Seabolt accordingly. From this judgment and sentence, he appeals. We reverse.

¶ 2 On March 3, 2004, a police officer with the Muskogee Police Department stopped Seabolt for failure to signal a left hand turn. Seabolt produced a driver's license and insurance verification. The officer reported the traffic stop to dispatch, ran Seabolt's license and began writing a warning citation.[1] The officer also called for a canine unit because Seabolt appeared nervous and he recognized the car as one he had seen earlier that day at a house suspected of drug activity.[2] The

---

1. Seabolt produced a valid license and insurance verification on the car. Seabolt told the officer the car belonged to his brother and the officer's record check confirmed it.

2. The officer testified that he had seen pedestrian and vehicle traffic that was consistent with drug activity at the house sometime in the seven days preceding Seabolt's arrest. The officer did not observe any drug related activity while Seabolt's car was at the house.

officer testified that, other than his perception that the driver was nervous, he did not see, hear or smell anything to indicate drugs were in the car. The canine unit arrived approximately 25 minutes later and the dog alerted on Seabolt's car. The officers searched the car and found a suitcase containing items commonly used in methamphetamine labs. The special investigation unit officer who responded to secure those items testified that he believed they had been used at least once to cook methamphetamine.

## The Validity of the Search

¶3 Seabolt claims the trial court erred in denying his motion to suppress and upholding the search of his car. He argues the officer did not have reasonable articulable suspicion to detain him the 25 minutes it took for the drug dog to arrive and that his detention exceeded the scope of the traffic stop making the ensuing search of his car illegal.

¶4 Seabolt moved to suppress the evidence of the search at the end of the Preliminary Hearing. The magistrate asked the parties to submit briefs on the issue. Those briefs are not contained in the record. The magistrate overruled Seabolt's motion without explanation and Seabolt did not renew his objection to the admission of the evidence at trial. When a defendant timely files a motion to suppress evidence but fails to renew the issue by objecting to the introduction of the evidence at trial, he waives his right to complain and this Court reviews the record for plain error. *Cheatham v. State*, 1995 OK CR 32, ¶48, 900 P.2d 414, 427. To be entitled to relief under the plain error doctrine, Seabolt must prove that an error occurred, that the error is plain and obvious, and that the error affected his substantial rights. *Hogan v. State*, 2006 OK CR 19, ¶38, 139 P.3d 907, 923.

¶5 When reviewing a trial court's ruling on a motion to suppress evidence based on an illegal search and seizure, we defer to the trial court's factual findings about the stop and search unless those findings are clearly erroneous. *Lee v. State*, 1983 OK CR 41, ¶6, 661 P.2d 1345, 1349–50. The ultimate conclusion drawn from those facts is a legal question we review *de novo*.[3] The trial court did not make any factual findings and noted only its conclusion that the search was valid in its minute order.[4]

¶6 A traffic stop is a seizure under the Fourth Amendment. *McGaughey v. State*, 2001 OK CR 33, ¶24, 37 P.3d 130, 136. The scope and duration of such a seizure must be related to the stop and must last no longer than is necessary to effectuate the stop's purpose. *Florida v. Royer*, 460 U.S. 491, 500, 103 S.Ct. 1319, 1325, 75 L.Ed.2d 229 (1983); *Terry v. Ohio*, 392 U.S. 1, 20, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889 (1968); *McGaughey*, 2001 OK CR 33, ¶¶24 and 27, 37 P.3d at 136–37. If the length of the investigative detention goes beyond the time necessary to reasonably effectuate the reason for the stop,

---

**3.** Judge Lumpkin states in dissent that appellate review of a trial court's determination of the reasonableness of a search or seizure under the Fourth Amendment should not be subject to de novo review. He contends that such determinations should be reviewed under some undefined but more highly deferential standard. In support of his position, Judge Lumpkin relies primarily on two sources of authority: (1) a recounting of the historical development of Anglo–American appellate process contained in Kelly Kunsch, *Standard of Review (State & Federal): A Primer*, Seattle University L.Rev. Vol. 18, No. 1, 12 (Fall 1994); and (2) Justice Scalia's dissent in *Ornelas v. United States*, 517 U.S. 690, 700–705, 116 S.Ct. 1657, 1663–1666, 134 L.Ed.2d 911, 921–924(1996)(Scalia J. dissenting). While Professor Kunsch's scholarly exposition certainly provides an interesting historical perspective, and Justice Scalia's dissent is thought-provoking, as always, we note that Justice Scalia was the single dissenting justice in the *Ornelas* case. In an eight-to-one opinion authored by Justice Rehnquist and joined by Justices Thomas, Kennedy, O'Connor, Souter, Breyer, Ginsburg, and Stevens, the Supreme Court unequivocally held that "determinations of reasonable suspicion and probable cause should be reviewed *de novo* on appeal." *Ornelas*, 517 U.S. at 699, 116 S.Ct. at 1663. The Court cautioned, however, that "a reviewing court should take care both to review findings of historical fact only for clear error and to give due weight to inferences drawn from those facts by resident judges and local law enforcement officers." *Id.* Our standard as set out above is nearly identical to that articulated by the *Ornelas* majority.

**4.** The minute order entered May 20, 2004 stated in relevant part, "Decision. Defendant's motion denied, search good."

the Fourth Amendment requires reasonable suspicion that the person stopped has committed, is committing or is about to commit a crime. *See State v. Paul*, 2003 OK CR 1, ¶ 3, 62 P.3d 389, 390.

¶ 7 The question presented is whether the 25 minute detention exceeded the scope of the initial traffic stop, and if so, whether the officer had reasonable suspicion to prolong Seabolt's detention. The State argues that the officer had reasonable articulable suspicion to prolong the detention and that the 25 minutes spent waiting for the drug dog to arrive was reasonable based on *Skelly v. State*, 1994 OK CR 55, 880 P.2d 401.

¶ 8 The traffic stop in *Skelly* was nothing like the one here. When the officer approached the Skellys' car, he smelled marijuana smoke. *Skelly*, 1994 OK CR 55, ¶ 2, 880 P.2d at 404. Mr. Skelly could not produce insurance verification and the records check showed Skelly had not properly transferred title of the car. *Id.* A back-up officer saw a marijuana cigarette in the ashtray and the Skellys were arrested. *Skelly*, 1994 OK CR 55, ¶ 3, 880 P.2d at 404. The canine unit was called and arrived in 20 minutes. *Skelly*, 1994 OK CR 55, ¶ 5, 880 P.2d at 404. We held there that the 20 minute response time was reasonable under the circumstances. *Skelly*, 1994 OK CR 55, ¶ 15, 880 P.2d at 405.

 ¶ 9 This Court is unwilling to impose a rigid time limitation on the duration of a traffic stop; however, we are concerned with the duration of the traffic stop in the present case. An examination of the record shows no circumstances which justify the length of this detention. Indeed the record leads us to conclude this was a routine traffic stop, which should have resulted in a correspondingly abbreviated detention.[5] The officer should have issued the warning citation to Seabolt expeditiously. Had he done so, Seabolt would have left the scene prior to the arrival of the canine unit. Without evidence in the record to show some reason why it took the officer 25 minutes to fill out the

warning citation and complete his traffic stop duties, a finding that the length of the detention exceeded the scope of the traffic stop is justified. We must decide whether the officer's justification for prolonging the detention was reasonable under the totality of the circumstances. *See Lunsford v. State*, 1982 OK CR 168, ¶ 11, 652 P.2d 1243, 1245.

¶ 10 The Kansas Court of Appeals recently considered whether an officer was justified in extending the detention of a motorist based on the driver's nervous behavior and the officer's observation of the car minutes before the stop at a home under police surveillance for drug activity. *State v. Boykins*, 34 Kan.App.2d 144, 118 P.3d 1287 (2005). It found that "mere propinquity" to others independently suspected of criminal activity together with the defendant's display of anxiety and nervousness when stopped for a traffic violation did not amount to reasonable suspicion of criminal activity. *Boykins*, 118 P.3d at 1291. The *Boykins* court found that nervous behavior alone is insufficient to create reasonable suspicion to prolong a traffic stop, but may contribute to a finding of reasonable suspicion if accompanied by other suspicious circumstances.[6] *Boykins*, 118 P.3d at 1290–91. That court also found that the defendant's brief stop at a suspected drug house without evidence the defendant did anything suspicious or was connected some way to the occupants of the house did not amount to reasonable suspicion of criminal activity. *Id.* at 1291.

 ¶ 11 Here the officer testified that Seabolt was nervous and fidgety while retrieving his license. The officer saw Seabolt's car at a house he suspected of drug activity. He did not observe the in and out traffic he associated with drug activity while Seabolt's car was parked there, nor did he see Seabolt. The officer had no information connecting Seabolt to the occupant of the house and the officer conceded he had not seen that occupant in 30 to 60 days. Under

---

5. "In a routine traffic stop a trooper may request a driver's license, vehicle registration and other required papers, run necessary computer checks, and then issue any warning or citation." *U.S. v. Gregoire*, 425 F.3d 872, 879 (10th Cir.2005).

6. This Court noted that nervous behavior alone did not create reasonable suspicion but could be considered with other circumstances. *State v. Paul*, 2003 OK CR 1, ¶ 3 n. 4, 62 P.3d at 390 n. 4.

these circumstances, the officer did not have reasonable suspicion to prolong the traffic stop. Seabolt's rights under the Fourth Amendment were violated as a matter of law and the evidence from the search should have been suppressed. The remaining evidence, if any, is insufficient to support a conviction and Seabolt's conviction must be reversed with instructions to dismiss. Our decision on the search and seizure issue renders moot Seabolt's other claims.

## DECISION

¶ 12 The Judgment and Sentence of the trial court is **REVERSED with Instructions to DISMISS.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2006), the **MANDATE** is **ORDERED** issued upon delivery and filing of this decision.

CHAPEL, P.J., and C. JOHNSON, J., concur.

LEWIS, J., concurs in results.

LUMPKIN, V.P.J., dissents.

LUMPKIN, Vice–Presiding Judge: Dissent.

¶ 1 I respectfully dissent to the Court's action in this case and take the opportunity to address what I believe is an abuse of the *de novo* standard of review. The development of legal standards of review has a long history. Regrettably, I believe too many courts use the label *de novo* without understanding the history and limitations on the concept. "Some courts [seem to] invoke it talismanically to authenticate the rest of their opinion". Kelly Kunsch, *Standard of Review (State & Federal): A Primer,* Seattle University L.Rev. Vol. 18, No. 1, 12 (Fall 1994).

¶ 2 Let me make it clear that I believe appellate courts always have the authority to interpret and apply the law. However, it is when appellate courts fail to respect the work of the trier of fact, especially in a jury trial, and seek to substitute their own view of the facts that I believe the appellate function goes astray. It is this type of action which erodes respect for the appellate role and causes the average citizen to loose faith in our judicial system.

¶ 3 To understand this view requires a historical look at the development of the entire appellate process. This has been done in a very scholarly fashion in the above cited law review article. For that reason, I will let the words of the article set out the historical perspective upon which this issue must be addressed.

¶ 4 In discussing standards of review, the article states that "standards range from quantum ('substantial evidence')", to "point of view ('*de novo*')", to "impression ('clearly erroneous' and 'arbitrary or capricious')", and provides the working definition that "[t]he **standard of review is the criterion by which the decision of a lower tribunal will be measured by a higher tribunal to determine its correctness or propriety**". *Id.,* at 14–15 (emphasis added).

¶ 5 The article notes that "nothing that could properly be called an appeal was known at early English common law before its fusion with equity in 1875." *Id.,* at 15. The process at that time was to bring an entirely "new action against the judge or jury in the original case." *Id.* "This so called 'attaint' was a quasi-criminal procedure. The focus of the inquiry was on the decisionmakers' actions or inactions within the context of the trial." *Id.* In effect, this was a trial on the trial. "The writ of error ultimately replaced the writ of attaint. It, too, was considered an entirely new proceeding, rather than a continuation of a previous one." *Id.*

¶ 6 "The process of reviewing a case itself was first introduced into the English court system by the Chancery courts. This review (called an appeal) took the form of a trial *de novo* complete with the taking of testimony and other evidence." *Id.,* at 16. "Conceptually, both the trial de novo and the writ of error were considered new suits rather than a continuation of existing suits. Therefore, there was no standard of review; there was merely a burden of proof in a new case." *Id.*

¶ 7 This is the system that initially provided the basis for the judicial process in the American colonies. "In adopting the Consti-

tution, the federal government continued to recognize the distinction between cases in law and cases in equity. Furthermore, the Federal Judiciary Act of 1789 recognized the writ of error as the appropriate vehicle for review of all cases at the federal level. Thus, review by writ of error applied to equity suits as well as to suits at law. It was not until 1803 that review by writs of appeal in equity was allowed in federal courts." *Id*

¶ 8 The article further states:.

One of the primary differences between the two methods of review was the ability to review facts. Under the writ of error, factual determinations were not subject to review. Under appeal, issues of fact as well as those of law were subject to full review. This made sense in an equity court because initially, all evidence in equity cases, including testimony (via interrogatory or deposition), was placed into the record. Evidence was not taken in open court as it was in cases at law. The reviewing court was thus in the exact same position as the trial court in determining facts.

. . .

Over time, equity practice in America departed from the broad *de novo* review of ancient chancery. While theoretically the review in equity cases was still that of a rehearing or trial de novo, there had grown up certain well-settled and often-reiterated principles observed by equity courts in considering findings of fact. Deference was accorded to most findings of fact at the trial level. This deference was a logical result of allowing oral testimony at equity trials . . . Ultimately, it was accepted as a rule that trial court findings, although not conclusive, had great weight with the appellate court. That 'great weight' was codified as the 'clearly erroneous' standard of Rule 52 when the Federal Rules of Civil Procedure were adopted."

*Id.*, at 17–18.

¶ 9 It should be noted the Federal Rules of Criminal Procedure have no provision similar to Rule 52(a). However, the U.S. Supreme Court has said, "the considerations underlying that rule apply with full force in a criminal context." *Id.*, at 24. "Facts found by a jury are reviewed with the common law 'substantial evidence' test. The sanctity of the Constitutional right to jury trial is the justification given for this enhanced deference." *Id.*

¶ 10 The writ of error was abolished by Congress in 1928 and by 1938 "an appeal was recognized for what it really was: a review of an existing case, rather than a new case." *Id.*, at 18. The new Federal Rules treated it as such.

Rule 52(a) stated: 'In *all* actions tried upon the facts without a jury . . . [f]indings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses. *Id.* Findings of fact by a jury were protected by the Seventh Amendment and thus continued to be reviewed only as they had been at common law. **The standard at common law was that the facts as found and stated by the court below were conclusive on review.** Issues of law continued to be reviewed *de novo*. (emphasis added).

*Id.*, at 19.

¶ 11 The article also analyzes the policy reasons for adherence to appellate rules of this type. The finality of the decision is important to the entire process and the system itself. *Id.*, at 19. This finality helps reduce court congestion, i.e. fewer parties appeal. *Id.*, at 20. The article also points out the importance of the morale of trial court judges and the fact that morale would be eroded by constant second guessing decisions which have been determined by a trier of fact. *Id.* "A better one [reason], perhaps, is that a high proportion of reversals on review erodes public confidence in trial courts." *Id.*

A second group of reasons for deferring to lower tribunal decisions helps specify which decisions should be accorded more deference. These reasons focus on the specific decision. Typically, the stated rationale for giving deference to the decision of a lower tribunal is that the decision-maker was in a better position to make findings on the issue . . . A second ratio-

nale for deference is preserving the sanctity of jury trials. Jury decisions have always been considered sacred in American jurisprudence. Juries protect parties from compliant, biased, or eccentric judges. Unless their decisions are given deference at the appellate stages, the right to jury trial will be an empty one, protecting only against trial judges, who might not make the ultimate determination.

*Id.,* at 20.

¶ 12 The meat of this issue falls to the characterization of what is to be decided, i.e. question of law, issue of fact, or a "mixed issue of law and fact." It is under the guise of this last characterization, which was appellate judge created, that I believe much mischief occurs in the system. By merely using the label of "mixed issue of law and fact" some courts seem to believe they can violate the established rules of applying the facts as determined by the trier of fact and retry the case in their own minds. The Seventh Amendment to the U.S. Constitution reveals what the Founding Fathers thought about this prospect; "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, **and no fact tried by a jury shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law.**" U.S. Const. amend. VII (emphasis added). As stated previously, the standard at common law was that the facts as found and stated by the court below were conclusive on review. Regrettably, some courts use the mixed question of law and facts label as a back door entry into disregarding the decisions of the trier of fact.

¶ 13 I believe that is the process being used in this case. Each of the triers of fact, i.e. the judge on the motion to suppress and the jury on guilt, have made a reasoned decision based on their interpretation of the evidence as presented, and any reasonable interpretation of those decisions would find that there was no abuse of discretion in the interpretation of that evidence. I believe that even under the label of mixed questions of law and fact an appellate court is bound to apply the facts as determined by the judge or

jury at the trial level, absent a finding that decision was made under passion, prejudice or the outside influence. *See Thrasher v. State,* 2006 OK CR 15, 134 P.3d 846, 850 (Lumpkin, V.P.J., concur in results); *Harris v. State,* 97 Okla.Crim. 259, 261 P.2d 909, 916 (1953). To do otherwise neuters the actions of a judge or jury and allows an appellate court to render a decision based on feelings rather than applying the weight and credit a trier of fact does during their decision process pursuant to the instructions on the law they have received. In this case, the Court says it is deciding a question of law *de novo,* however it is the fact that the stop for twenty-five minutes is unreasonable that is the basis for the decision. The trial court determined the stop and period of detention was reasonable. Therefore, what the Court is doing is substituting its analysis of the facts for the trial court. Reasonableness of the time of the detention resulting from a stop is a fact question that will vary from case to case.

¶ 14 I believe Justice Scalia recognized this problem in his dissent in *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996) where he stated in part:

The Court today decides that a district court's determinations whether there was probable cause to justify a warrantless search and reasonable suspicion to make an investigatory stop should be reviewed *de novo.* We have in the past reviewed some mixed questions of law and fact on a *de novo* basis, and others on a deferential basis, depending upon essentially practical considerations. Because, with respect to the questions at issue here, the purpose of the determination and its extremely fact-bound nature will cause *de novo* review to have relatively little benefit, it is in my view unwise to require courts of appeals to undertake the searching inquiry that standard requires. I would affirm the judgment of the Court of Appeals.

As the Court recognizes, determinations of probable cause and reasonable suspicion involve a two-step process. First, a court must identify all of the relevant historical facts known to the officer at the time of

the stop or search; and second, it must decide whether, under a standard of objective reasonableness, those facts would give rise to a reasonable suspicion justifying a stop or probable cause to search. See *ante*, at 1661–1662. Because this second step requires application of an objective legal standard to the facts, it is properly characterized as a mixed question of law and fact. See *ante*, at 1662; . . .

Merely labeling the issues "mixed questions," however, does not establish that they receive *de novo* review. While it is well settled that appellate courts "accep[t] findings of fact that are not 'clearly erroneous' but decid[e] questions of law *de novo*," there is no rigid rule with respect to mixed questions. We have said that "deferential review of mixed questions of law and fact is warranted when it appears that the district court is 'better positioned' than the appellate court to decide the issue in question or that probing appellate scrutiny will not contribute to the clarity of legal doctrine."

The primary factors that counsel in favor of deferential review of some mixed questions of law and fact-expertise of the district court and lack of law-clarifying value in the appellate decision-are ordinarily present with respect to determinations of reasonable suspicion and probable cause. The factual details bearing upon those determinations are often numerous and (even when supported by uncontroverted police testimony) subject to credibility determinations. An appellate court never has the benefit of the district court's intimate familiarity with the details of the case-nor the full benefit of its hearing of the live testimony, unless the district court makes specific findings on the "totality of the circumstances" bearing upon the stop or search. As we recognized in *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 110 S.Ct. 2447, 110 L.Ed.2d 359 (1990), a case holding that deferential (abuse-of-discretion) review should be applied to a district court's Federal Rules of Civil Procedure 11 determination that an attorney did not conduct a reasonable inquiry or entertain a "substantiated belief" regarding the non-frivolousness of the complaint, see id., at

393, 110 S.Ct. at 2454: A district court, "[f]amiliar with the issues and litigants . . . is better situated than the court of appeals to marshal the pertinent facts and apply the fact-dependent legal standard. . . ."

Moreover, as the Court acknowledges, "reasonable suspicion" and "probable cause" are "commonsense, nontechnical conceptions that deal with ' "the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." ' " *Ante*, at 1661. Where a trial court makes such commonsense determinations based on the totality of circumstances, it is ordinarily accorded deference. What we said in a case concerning the question whether certain payments were a "gift" excludable from income under the Internal Revenue Code is equally pertinent here.

"Decision of the issue presented in these cases must be based ultimately on the application of the fact-finding tribunal's experience with the mainsprings of human conduct to the totality of the facts of each case. The nontechnical nature of the ⋯ standard, the close relationship of it to the data of practical human experience, and the multiplicity of relevant factual elements, with their various combinations, creating the necessity of ascribing the proper force to each, confirm us in our conclusion that primary weight in this area must be given to the conclusions of the trier of fact."

With respect to the second factor counseling in favor of deferential review, level of law-clarifying value in the appellate decision: Law clarification requires generalization, and some issues lend themselves to generalization much more than others. Thus, in *Pierce v. Underwood*, 487 U.S. 552, 562, 108 S.Ct. 2541, 2548–49, 101 L.Ed.2d 490 (1988), a principal basis for our applying an abuse-of-discretion standard to a district court's determination that the United States' litigating position was "substantially justified" within the meaning of the Equal Access to Justice Act, 28 U.S.C. § 2412(d), was that the question was "a multifarious and novel question, little susceptible, for the time

being at least, of useful generalization." Probable cause and reasonable suspicion determinations are similarly resistant to generalization. As the Court recognizes, these are "fluid concepts," " 'not readily, or even usefully, reduced to a neat set of legal rules' "; and "because the mosaic which is analyzed for a reasonable-suspicion or probable-cause inquiry is multifaceted, 'one determination will seldom be a useful "precedent" for another.' " *Ante,* at 1661, 1662 (quoting *Illinois v. Gates, supra,* [462 U.S. 213] at 232, 238, n. 11, 103 S.Ct. [2317] at 2329, 2332, n. 11 [76 L.Ed.2d 527] ). The Court maintains that there will be exceptions to this-that fact-patterns will occasionally repeat themselves, so that a prior *de novo* appellate decision will provide useful guidance in a similar case. *Ante,* at 1662–1663. I do not dispute that, but I do not understand why we should allow the exception to frame the rule. Here, as in *Anderson v. Bessemer City,* 470 U.S. 564, 574–575, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985), "[d]uplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources."

. . .

In the present case, an additional factor counseling against *de novo* review must be mentioned: The prime benefit of *de novo* appellate review in criminal cases is, of course, to prevent a miscarriage of justice that might result from permitting the verdict of guilty to rest upon the legal determinations of a single judge. But the issue in these probable-cause and reasonable-suspicion cases is not innocence but deterrence of unlawful police conduct. That deterrence will not be *at all* lessened if the trial judge's determination, right or wrong, is subjected to only deferential review.

. . .

Finally, I must observe that the Court does not appear to have the courage of its conclusions. In an apparent effort to reduce the unproductive burden today's decision imposes upon appellate courts, or perhaps to salvage some of the trial court's superior familiarity with the facts that it has cast aside, the Court suggests that an appellate court should give "due weight" to a trial court's finding that an officer's inference of wrongdoing (*i.e.,* his assessment of probable cause to search) was reasonable. *Ante,* at 1663. The Court cannot have it both ways. This finding of "reasonableness" is precisely what it has told us the appellate court must review *de novo;* and in *de novo* review, the "weight due" to a trial court's finding is zero. In the last analysis, therefore, the Court's opinion seems to me not only wrong but contradictory.

517 U.S. at 700–705, 116 S.Ct. at 1664–1666 (certain citations omitted).

¶ 15 I do not believe Justice Scalia went far enough in analyzing the historical basis for these rules. Too often, as judges and lawyers, we overlook the obvious just because we have become accustomed to addressing matters in a particular way. On this issue if an appellate court is prohibited from retrying the facts when it is a question of fact that has been presented, to be consistent the appellate court should still be prohibited from retrying the facts when an issue of law is intertwined with those facts. The court should in both instances interpret and apply the law to those facts as determined by the judge or jury absent a showing of abuse of discretion, i.e. the clearly erroneous test. *See Hogan v. State,* 2006 OK CR 19, 139 P.3d 907, 951–52 (Lumpkin, V.P.J. concur in results); *Blonner v. State,* 2006 OK CR 1, 127 P.3d 1135, 1144–46 (Lumpkin, V.P.J., concur in part/dissent in part); *Pickens v. State,* 2005 OK CR 27, 126 P.3d 612, 621–25 (Lumpkin, V.P.J., dissenting); *Lambert v. State,* 2005 OK CR 26, 126 P.3d 646, 660 (Lumpkin, V.P.J. dissenting).

¶ 16 Here the trier of fact determined the stop was supported by the facts, the delay was reasonable, and the dog provided probable cause for the search. Instead of applying those facts as found by the trier of fact, this Court wants to start their stopwatch and determine at which minute of the delay the stop became unreasonable. In other words, an appellate court far removed from the time and place of the original decision, in an eso-

teric and philosophical mood, seeks to overlook the decision of the fact finder and substitute its wisdom for that of the trial court and jury. I cannot agree to that type of arbitrary use of the authority given to us. As I have written before, this type of conduct corresponds to the analysis of Chief Justice Maura Corrigan which equates appellate judges to the philosopher kings of Plato's *Republic,* his treatise on the ideal state. *Textualism in Action: Judicial Restraint on the Michigan Supreme Court,* Texas Review of Law & Politics, Vol. 8, No. 2 (Spring 2004).

¶ 17 I believe the problem has evolved due to appellate courts not being willing to exercise self-discipline and merely adjudicate the issues before them. Using this guise is a method of reaching out and touching issues either not presented or already decided in order to render a decision the court feels is needed. I realize this issue boils down to judicial philosophy and the limitations on judicial power. However, if we are to have a judicial system where judges and juries are tasked with the responsibility to make decisions on the facts of a case then appellate courts should honor those decisions. To do otherwise leaves the law unsettled and encourages repeated appeals hoping the biorhythmic chart for the court will allow success on a particular day.

¶ 18 This same belief applies to the fact courts should not be legislating from the bench but should be faithful in applying the plain language of the statutes and constitutions. Policy decisions are for legislatures. All too often, courts have used the vehicle of mixed questions of law and fact as a way of legislating policy. See Kelly Kunsch, *Standard of Review (State & Federal): A Primer,* Seattle University L.Rev. Vol. 18, No. 1, 29. It has always been my belief that unsettledness in the law, or the application of it, deprives defendants of the effective assistance of counsel due to the fact counsel is unsure of how a court would rule on a given set of facts, or if it is one of those cases where the court will reinterpret those facts already decided. The same is true in empowering the State to appropriately evaluate and file cases due to the uncertainty of the law. These are the types of problems that cause the average citizen to question our judicial system and create self inflicted damage to respect for the system and its process.

¶ 19 In this case, I believe the judge and jury rendered reasonable decisions that are supported by the evidence. I would affirm the judgment and sentence.