2008 OK CR 24

**Loyd COFFIA, Appellant,**

v.

**STATE of Oklahoma, Appellee.**

No. F–2006–965.

Court of Criminal Appeals of Oklahoma.

July 29, 2008.

An Appeal from the District Court of Creek County; the Honorable Douglas W. Golden, District Judge.

Allen R. Malone, Attorney at Law, Tulsa, OK, Attorney for Defendant at trial.

Pamela Hammers, Assistant District Attorney, Sapulpa, OK, Attorney for State at trial.

Gloyd L. McCoy, Riggs, Abney, Neal, Turpen, Orbinson & Lewis, Oklahoma City, OK, Attorney for appellant on appeal.

W.A. Drew Edmondson, Oklahoma Attorney General, Jennifer L. Strickland, Assistant Attorney General, Oklahoma City, OK, Attorneys for appellee on appeal.

### *OPINION*

A. JOHNSON, Judge.

¶1 Appellant Loyd Coffia was tried by jury and convicted in the District Court of Creek County, Case No. CF–2004–120, of Trafficking in Methamphetamine, After Former Conviction of a Felony (Count 1) in violation of 63 O.S.Supp.2002, § 2–415, Unlawful Possession of Controlled Dangerous Substance without Tax Stamp Affixed, After Former Conviction of a Felony (Count 2) in violation of 68 O.S.2001, § 450.8, Maintaining a Vehicle Where a Controlled Dangerous Substance is Kept, After Former Conviction of a Felony (Count 3) in violation of 63 O.S.2001, § 2–404, and Possession of Drug Paraphernalia (Count 4) in violation of 63 O.S.2001, § 2–405. The jury fixed punishment at fifteen years imprisonment and a $25,000 fine on Count 1 and elected not to impose any term of imprisonment or fine on Counts 2, 3 and 4. The Honorable Douglas W. Golden, who presided at trial, sentenced Coffia accordingly. From this judgment and sentence Coffia appeals, raising ten issues only three of which merit full discussion.

### FACTS

¶2 On February 29, 2004 at approximately 2:30 a.m., Oklahoma Highway Patrol Trooper Mike Yelton stopped as part of his community caretaking function to check on the welfare of two individuals standing beside a car parked on the shoulder of Highway 33. Steve Gibson, who had been driving, was standing next to the driver's side door and Appellant Coffia was standing next to the front passenger door. When the trooper parked behind them and activated his emergency lights, both Coffia and Gibson walked towards the cruiser. Trooper Yelton asked Coffia to have a seat in the passenger side of the parked car while Gibson joined him in the cruiser. Trooper Yelton spoke to each man separately and required each to produce his driver's license. He told the men that he was documenting his time with them and would get them on their way quickly. Dispatch reported that Gibson's license was suspended, prompting the trooper to inform, Coffia, the owner of the car, that he would have to drive. When the trooper returned Coffia's license, he asked for consent to search the car. Coffia consented and Yelton found methamphetamine in the backseat totaling 430.6 grams.

### I. THE SEARCH

¶3 Coffia claims the videotape of the search and drug evidence seized from his car

should have been suppressed. He argues the trooper did not have reasonable articulable suspicion to detain him and that his consent to search was not voluntary, making the ensuing search of his car illegal.

¶ 4 Coffia moved to suppress the evidence of the search before his preliminary hearing. The magistrate held Coffia's preliminary hearing and later denied his motion after briefing and argument. Coffia filed a second motion to suppress, which was denied by the district court on the basis that Coffia's consent was freely given.[1] Because Coffia did not object to the admission of the evidence at trial, our review is for plain error only. *See Seabolt v. State*, 2006 OK CR 50, ¶ 4, 152 P.3d 235, 237.

¶ 5 When reviewing a trial court's denial of a motion to suppress evidence, we accept its factual findings unless those findings are clearly erroneous and view the evidence in the light most favorable to the State. *See Gomez v. State*, 2007 OK CR 33, ¶ 5, 168 P.3d 1139, 1141–42; *Seabolt*, 2006 OK CR 50, ¶ 5, 152 P.3d at 237. The determination of whether a search or seizure is unreasonable and in violation of the Fourth Amendment, however, is a question of law we review *de novo*. *Gomez*, 2007 OK CR 33, ¶ 5, 168 P.3d at 1142; *Seabolt*, 2006 OK CR 50, ¶ 5, 152 P.3d at 237.

¶ 6 The question presented here is twofold: 1) whether the officer unlawfully detained Coffia during a motorist assist call by demanding his driver's license and conducting a status check; and 2) whether Coffia's consent to search was voluntary.

### A. Initial Seizure

¶ 7 The first issue is whether an officer in performing a motorist assist call can demand to see a driver's license and conduct a status check of the licensee at the scene. This is a case of first impression for this Court. We hold that the public interest in asking for a license and conducting a status check outweighed the minimal intrusion involved and did not violate the Fourth Amendment under the circumstances of this case.

¶ 8 Coffia argues that the trooper could have assessed the situation and effectuated a welfare check by simply asking if his assistance was needed and if not, allowing Coffia to leave without asking him to produce his driver's license and without checking its status. He maintains that the trooper's "motorist assist" turned into an unlawful seizure when the trooper detained him and checked the status of his license without reasonable suspicion.

¶ 9 Courts in other jurisdictions have not been uniform in deciding the issue of whether a seizure occurs when an officer, checking on the well-being of an already stopped motorist, requests the motorist's license and registration despite no evidence the motorist has committed a motor vehicle offense or other criminal act. Some courts have held that a limited and reasonable seizure has occurred,[2] while others have held that no

---

1. The docket sheet reflects that no court reporter was present at the hearing on Coffia's second motion to suppress. *See* Entry 04–15–2005.

2. *See State v. Brunelle*, 145 N.H. 656, 766 A.2d 272, 274 (2000) (assuming seizure occurred, officer's actions in aiding motorist with disabled vehicle and then requesting the driver's license and vehicle registration was part of a limited community caretaking exception, and request for such information was reasonable "in the event that any questions about the vehicle or [the trooper's] contact with the owner subsequently arose"); *State v. Godwin*, 121 Idaho 491, 826 P.2d 452, 455–57 (1992) (police officer's conduct in asking for and running a status check on the defendant's license was entirely reasonable); *O'Donnell v. State*, 200 Ga.App. 829, 409 S.E.2d 579, 582 (1991) (considering appellant had voluntarily stopped in a public rest area, parked, and laid down in the vehicle at night, causing [the trooper] to have a legitimate concern primarily regarding his medical status but also because signs prohibiting overnight parking in the rest area apparently were being ignored, it was not unreasonable within the meaning of the Fourth Amendment to the United States Constitution for [the trooper] thereafter to initiate promptly a routine and limited inquiry to determine the appellant's identity); *State v. Ellenbecker*, 159 Wis.2d 91, 464 N.W.2d 427, 430 (Ct.App. 1990)(the public interest in permitting an officer to request a driver's license and run a status check during a lawful police-driver contact outweighs the minimal intrusion on the driver). *See also State v. Reynolds*, 119 N.M. 383, 890 P.2d 1315, 1317 (1995) (officer who stops a motorist for safety reasons may reasonably detain the vehicle and its passengers for the purpose of

seizure occurs at all when an officer requests the license and registration of a motorist during a welfare check.[3] At least one court has determined that such a request is an unjustified seizure.[4]

¶ 10 In *State v. Ellenbecker*, the Wisconsin Court of Appeals framed the constitutional question thus: "whether there was a 'seizure' of [the defendant] and, if so, whether the seizure met the constitutional requirement of reasonableness." *Ellenbecker*, 464 N.W.2d 427, 429. That court assumed that a seizure had occurred because there was a display of police authority which could have made the defendant feel that he was not free to refuse the officer's request for his license as the officer was in uniform and was driving a marked squad car whose emergency lights were activated. *Id.* In considering the reasonableness of the seizure, the court said:

> Reasonableness must be determined in light of the fact that the inspector's request for [the defendant's] license and the status check came under the community caretaker function of the police. A community caretaker action is not an investigative *Terry* stop and thus does not have to be based on a reasonable suspicion of criminal activity. *See Terry v. Ohio*, 392 U.S. 1, 21–22, 88 S.Ct. 1868, 1879–1881, 20 L.Ed.2d 889 (1968). A community caretaker action is one that is totally divorced from the detection, investigation or acquisition of evidence relating to the violation of a criminal statute. *Cady v. Dombrowski*, 413 U.S. 433, 441, 93 S.Ct. 2523, 2528, 37 L.Ed.2d 706 (1973).
>
> In a community caretaker case, reasonableness is determined by balancing the public need and interest furthered by the police conduct against the degree of and nature of the intrusion upon the privacy of

the citizen. *State v. Anderson*, 142 Wis.2d 162, 168, 417 N.W.2d 411, 413 (Ct.App. 1987). In [the defendant's] case, the seizure was reasonable because there is a public interest in permitting police to request a driver's license from a motorist with a disabled vehicle and in running a status check on the license.

*Ellenbecker*, 464 N.W.2d at 429 (omitted).

¶ 11 *Ellenbecker* listed several reasons for permitting a police officer performing a motorist assist to ask for a driver's license: 1) officers are often required to document in written reports their contact with citizens; 2) an officer needs to know whom he or she is assisting in the event a citizen later complains about improper behavior on the part of the officer or makes any kind of legal claim against the officer; and 3) even seemingly innocent activity, such as refueling a disabled car, could later turn out to be theft of a car that was left on the shoulder of the highway. *Id.* at 430. The court found that the public interest in producing a license was implicitly recognized in the Wisconsin statute that gives law enforcement officers the authority to require a driver of a motor vehicle to display his license on demand.[5] *Id.* The court made clear that officers do not have unfettered discretion to stop drivers and request a display of a driver's license, but distinguished the case before it, noting that the defendant was not singled out for a spot check of his license and that he was already stopped when the officer stopped and offered aid. *Id.*

¶ 12 The *Ellenbecker* court also found a public interest in running a status check on a license. "The reason for allowing police to request a driver's license on demand is to deter persons from driving without a valid license, since a license is a statement that the

asking for identification, registration, and/or proof of insurance).

**3.** *See Commonwealth v. Evans*, 436 Mass. 369, 764 N.E.2d 841, 846 (2002)(police trooper's request for the defendant's driver's license and vehicle registration during welfare check did not constitute a seizure within the meaning of the Fourth Amendment).

**4.** *See State v. DeArman*, 54 Wash.App. 621, 774 P.2d 1247, 1249 (1989) (once it became clear to

officer that the motorist's car was not disabled and did not need assistance, officer had no reason to proceed with stop and request motorist's driver's license). *See also Search And Seizure: Lawfulness Of Demand For Driver's License, Vehicle Registration, or Proof of Insurance Pursuant to Police Stop to Assist Motorist*, 19 A.L.R.5th 884 (1994).

**5.** Oklahoma has a similar statute. 47 O.S.2001, § 6–112.

driver can be expected to comply with the state's requirements for safe driving. Where it is reasonable for a police officer to ask for a license, running a status check on the license is simply carrying out this deterrent function of the law." *Id.* The court weighed the public interests outlined for asking for a license and running a status check against the intrusion on the citizen and found that "[r]equesting a license and conducting a status check after a lawful contact is but a momentary occurrence." *Id.* The court concluded that the public interest in asking for the license and conducting the status check outweighed the minimal intrusion involved and passed the Fourth Amendment test of reasonableness. *Id.*

¶ 13 The reasoning of the Wisconsin court is sound and consistent with our review of Oklahoma law concerning the legality of a detention. Here, Trooper Yelton came upon two men standing next to a parked car on the shoulder of a deserted highway around 2:30 a.m. As part of his community caretaking function, he stopped to see if they needed help. To assess the situation and for his safety, he spoke to the men separately, verifying their identities and driving status.[6] He told both Coffia and Gibson that he was documenting his contact with them and would get them on their way quickly. The status check revealed that Gibson's license was, in fact, suspended, prompting Trooper Yelton to advise Coffia, the owner of the car, that he would have to drive. The intrusion was minimal at best. Having considered these facts, we find the public interest in asking for Coffia's license and conducting a status check outweighed the minimal intrusion involved and did not violate the Fourth Amendment in this case.

### B. Consent

■ ¶ 14 We must now decide if the district court correctly concluded that Coffia's consent was voluntary. The police may detain a driver longer than necessary for the initial stop with consent. *See State v. Goins,* 2004 OK CR 5, ¶ 17, 84 P.3d 767, 770. A driver must be permitted to proceed after a

routine traffic stop if a license and registration check reveals no reason to detain the driver unless the officer has reasonable articulable suspicion of other crimes or the driver voluntarily consents. *See Id.* at ¶ 13, 84 P.3d at 770. To determine whether an encounter was consensual, courts consider if a reasonable person would have felt free to leave considering the totality of the circumstances. *Id.* at ¶ 18, 84 P.3d at 770. A "consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer." *Id.* at ¶ 20, 84 P.3d at 771 *quoting United States v. West,* 219 F.3d 1171, 1176 (10th Cir.2000). Applying this test, a "traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority." *Id.*

¶ 15 All the credible evidence indicates Trooper Yelton was polite and friendly when he made his request. There is no claim that Trooper Yelton touched Coffia, displayed a weapon, used a commanding tone of voice or intimidating body language. The videotape shows Trooper Yelton returning Coffia's driver's license and inquiring whether Coffia had time to answer another question. Coffia agreed, denied that his car contained any contraband and then gave Trooper Yelton consent to search. The record supports a finding that a reasonable person would have felt free to leave and that Coffia's consent was voluntarily given. The search of Coffia's car was based on his voluntary consent and the evidence obtained from the search was properly admitted against him. The district court did not err in denying Coffia's motion to suppress.

¶ 16 Coffia also claims that his trial attorney was ineffective for failing to object to the admission of the evidence discovered during the search of his car. This claim must fail because he cannot show prejudice from his attorney's actions. *See Head v. State,* 2006 OK CR 44, ¶ 23, 146 P.3d 1141, 1148. For the reasons discussed above, the trooper's

---

**6.** There is also a public interest served by questioning individuals separately when checking their welfare to insure one is not being held against her will.

demand for Coffia's driver's license and status check did not violate the Fourth Amendment and Coffia's consent to the search of his car was voluntary.

## II. RANGE OF PUNISHMENT INSTRUCTION

¶ 17 The parties agree that the jury was incorrectly instructed on the range of punishment for drug trafficking. The jury was instructed that the range of punishment for trafficking methamphetamine was fifteen years to life and a fine of not less than $25,000 nor more than $200,000. The jury should have been instructed that the range of punishment was six years to life and a fine of not more than $20,000. 63 O.S.Supp.2002, § 2–415(D)(2); 63 O.S.Supp.2003, § 2–401(B)(2).

■ ¶ 18 Although Coffia did not object to the court's instruction below, an instruction that incorrectly sets forth the range of punishment constitutes plain error. *See Taylor v. State,* 2002 OK CR 13, ¶ 4, 45 P.3d 103, 105; *Scott v. State,* 1991 OK CR 31, ¶ 12, 808 P.2d 73, 77. Both parties agree that sentence modification is the appropriate remedy in this case. We find that Coffia's sentence for drug trafficking must be modified to six years imprisonment with no fine.

## III. SUFFICIENCY OF THE EVIDENCE

■ ¶ 19 Coffia argues that his conviction for maintaining a drug vehicle should be reversed because the State failed to prove anything other than a single transportation of drugs.

¶ 20 The State must prove two elements in a prosecution for Maintaining a Vehicle under 63 O.S.2001, § 2–404:(1) that a "substantial purpose" of the vehicle was for the keeping, selling, or using of controlled dangerous substances; and (2) that the activity giving rise to the charge was more than a single, isolated activity. *See Dodd v. State,* 1994 OK CR 51, ¶ 21, 879 P.2d 822, 828; *Howard v. State,* 1991 OK CR 76, ¶ 9, 815 P.2d 679, 683. The evidence at trial showed that Coffia and Gibson went to Arizona and then to California where Coffia visited family. He and

Gibson purchased some methamphetamine and were on their way back to Illinois when they stopped on Highway 33 to rest and encountered Trooper Yelton. This fact alone is insufficient to demonstrate that a "substantial purpose" of the vehicle was for the keeping, selling, or using of drugs or that the car was used more than this one time. For that reason, Coffia's conviction for Maintaining a Vehicle Where a Controlled Dangerous Substance is Kept is reversed and the case remanded to the District Court with instructions to dismiss.

## IV. REMAINING PROPOSITIONS

¶ 21 Coffia's remaining seven propositions are without merit. His claim challenging the admission of his co-defendant's testimony as "fruit of the poisonous tree" fails because the detention and consent search were lawful. His challenge to the admission of the portion of the videotape showing money being found in a suitcase is denied because he fails to cite any authority to support his claim or explain how he was prejudiced by its admission. Rule 3.5(A)(5), *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2008). The prosecutor's remarks in opening statement, as well as her questions to a defense witness, were proper. *See Howell v. State,* 2006 OK CR 28, ¶ 7, 138 P.3d 549, 556; *Hawkins v. State,* 1989 OK CR 72, ¶ 12, 782 P.2d 139, 141. Coffia's ineffective assistance of counsel claim fails because he can show no prejudice from his attorney's actions. *See Head v. State,* 2006 OK CR 44, ¶ 23, 146 P.3d 1141, 1148. Nor do we find any merit in Coffia's cumulative error and harmless error arguments. *See Pavatt v. State,* 2007 OK CR 19, ¶ 13, 159 P.3d 272, 278–79; *DeRosa v. State,* 2004 OK CR 19, ¶ 100, 89 P.3d 1124, 1157. His request for an evidentiary hearing to investigate whether Gibson received benefits for his testimony is **DENIED** because he has not provided any evidence to support his request or followed this Court's rules to obtain a hearing. Rule 3.11, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2008).

## DECISION

¶ 22 The Judgment and Sentence of the District Court on Counts 2 and 4 is **AF-**

FIRMED. Coffia's judgment for drug trafficking (Count 1) is **AFFIRMED**. His sentence, however, is **MODIFIED** to six years imprisonment. Coffia's conviction for Maintaining a Drug Vehicle (Count 3) is **REVERSED** and the matter **REMANDED with instructions to dismiss.** Under Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch.18, App. (2008), the **MANDATE** is **ORDERED** issued upon the delivery and filing of this decision.

C. JOHNSON, V.P.J. and LEWIS, J., concur.

LUMPKIN, P.J., specially concurs.

CHAPEL, J., recuse.

LUMPKIN, Presiding Judge: Specially Concurs.

¶ 1 I concur in the results reached by the Court in this case. However, I disagree this is a case of first impression and write to point out how this Court's jurisprudence allows the same result.

¶ 2 First, in *Leaf v. State,* 1983 OK CR 167, 673 P.2d 169, this Court discussed and applied the "public service function" of the police recognizing "an important aspect of a policeman's work is the assistance of those in need of help, the so-called 'public service function'". *Id.* at 171. There, the Court, citing to *United States v. Mendenhall,* 446 U.S. 544, 554, 100 S.Ct. 1870, 1877, 64 L.Ed.2d 497 (1980), determined when a seizure took place, stating "the test is whether, in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." Previously, in *Workman v. State,* 1971 OK CR 493, 491 P.2d 308, 309, the Court summarily dismissed an argument regarding the legality of an arrest—a sheriff stopped to check a vehicle stalled in the road—as being "patently frivolous". The Court said, "from observing the stalled vehicle, the sheriff not only had the right, but also the duty, to lend assistance in removing the stalled vehicle from the highway". *Id.*

¶ 3 Second, this Court's jurisprudence clearly sets out the rules regarding investigative detentions and the length of time al-

lowed to perform them. *See Seabolt v. State,* 2006 OK CR 50, ¶ 6, 152 P.3d 235, 237–38 (citing *State v. Paul,* 2003 OK CR 1, ¶ 3, 62 P.3d 389). In *State v. Goins,* 2004 OK CR 5, ¶ 13, 84 P.3d 767, 770, we stated, "Lengthening the detention for further questioning beyond that related to the initial stop is permissible in two circumstances. First the officer may detain the driver for questioning unrelated to the initial stop if he has an objectively reasonable and articulable suspicion illegal activity has occurred or is occurring. Second, further questioning unrelated to the initial stop is permissible if the initial detention has become a consensual encounter." That reasoning applies in this case for we're dealing with the analogous situation of an officer stopping to check on the health and welfare of a citizen (public service function) which evolved into a consensual encounter.

¶ 4 Third, the law in Oklahoma regarding when a seizure occurs is clear. In *Skelly v. State,* 1994 OK CR 55, ¶ 11–13, 880 P.2d 401, 405, the Court found that a seizure of a person occurs within the meaning of the Fourth Amendment when, in light of all the attendant circumstances, a reasonable person would have believed he was not free to leave, and went further to explain the framework of the legal basis for that rule. We have also stated that the distinction between an investigatory detention and seizure is largely a matter of degree because both involve a significant intrusion upon the privacy of the individual. *Sowell v. State,* 1980 OK CR 98, ¶ 3, 620 P.2d 429, 430.

> The reasonableness of the seizures or detentions that are less intrusive than a traditional arrest depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers. Consideration of the constitutionality of such seizures involves a weighing of the gravity of the public concerns served by the seizure, the degree to which the seizure advances the public interest, and the severity of the interference with the individual liberty.

*Id.* (citing *U.S. v. Brignoni–Ponce,* 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975)). Thus, in a situation where an officer initiates

an investigative detention based on a concern of a citizen's welfare, the detention should be viewed by weighing the gravity of the public concerns served by the seizure (citizen's welfare), with the degree that the officers investigative detention interfered with the citizens liberties.

¶ 5 Fourth, the same is true for determining the validity of a consent. In *Goins, supra,* we set out the procedure to be followed in analyzing whether an extended stop becomes a consensual encounter. *Id.* at 771. In doing so we held "[t]his Court uses the same test for the voluntariness of consent as is used in federal courts; the test for voluntariness is to be judged from a totality of the circumstances. (citations omitted)". *Id.* The Court went on to explain, "[a]lthough this Court may construe Oklahoma's Constitutional protections from unlawful search and seizure more narrowly than those found in the United States Constitution, there is no logical reason to do so here." *Id.*

¶ 6 Fifth, while I think the Wisconsin Court of Appeals performed a correct analysis and delivered a well articulated decision in *State v. Ellenbecker,* 159 Wis.2d 91, 464 N.W.2d 427, 430 (Wis.Ct.App.1990), I do not believe we should ignore Oklahoma jurisprudence and adopt the holding of an intermediate appellate court from a non-relevant jurisdiction. Oklahoma lawyers and judges are not bound by or familiar with Wisconsin law. While we can look to other states for reference and analogy, we should not be adopting the decisions of those states carte blanche. Oklahoma lawyers and judges can foresee development of the logical progression of the law based on our jurisprudence, but they cannot foresee the cherry picking of a decision from another state and inserting that decision as a part of our jurisprudence. Foreseeability is an integral part of a lawyer's ability to provide effective assistance of counsel and a judge to ensure error does not occur at trial. I admit my view is shaded by my years on the trial bench and an appreciation of the initiative that trial lawyers exercise in representing their clients. While the Court's opinion states "The reasoning of the Wisconsin court is sound and consistent with our review of Oklahoma law concerning the legality of a detention", it does not cite the Oklahoma law upon which the decision is based. In addition, the opinion proceeds to cite the Wisconsin court's dicta, which pontificates on many possible reasons the officer would have for making contact. I can imagine the possibility in the future that Wisconsin law may change and an enterprising defense attorney or prosecutor arguing that change is applicable in Oklahoma because of the way the opinion merely adopts *Ellenbecker.* The trial judge is then placed in the quandary of trying to decide how much weight to give an opinion from another jurisdiction. When we can draft our opinions in such a way as to preclude that quandary, we should. In this way we ensure judicial economy and provide certainty in the law.

¶ 7 Finally, I believe Oklahoma case law supports the decision of the Court in this case as I have set out above as to the public welfare stop, seizure of the person and consent. I would affirm the conviction, apply Oklahoma law in deciding the case, and modify the sentence to ten (10) years, rather than six years, to correct the instructional error. An even better result would be to remand the case for re-sentencing pursuant to 22 O.S.2001, § 929.