2005 OK CR 25

**The STATE of Oklahoma, Appellant**

v.

**Steven James Earl KEMP, Appellee.**

**No. S–2009–65.**

Court of Criminal Appeals of Oklahoma.

Sept. 15, 2009.

Gerald C. Dennis, Dennis & Branam Law Office, Antlers, OK, attorney for defendant/appellee in district court and appeal.

Greg Jenkins, Assistant District Attorney, Atoka, OK, attorney for state/appellant in district court and appeal.

***OPINION***

A. JOHNSON, Vice Presiding Judge.

¶ 1 Steven James Earl Kemp was charged by Information in the District Court of Atoka County, Case No. CF–2007–92, with Cultivation of Marihuana, After Former Conviction of Two Felonies, in violation of 63 O.S.2001, § 2–509(A) and (B) and 21 O.S.Supp.2002, § 51.1.[1] The district court granted Kemp's motion to suppress evidence by finding that Kemp's consent was not voluntarily given and, therefore, the evidence was obtained as the result of an unlawful search. The State appeals claiming the district court erred by suppressing the evidence.

¶ 2 The single issue presented is whether the district court properly granted Kemp's

---

1. The charging information is not included in the record on appeal. The State asserts in its brief, however, that an amended information was filed on August 6, 2007, charging Kemp with "Cultivation of Marihuana After Former Conviction of Two Felonies" (Aplt's Brief at 1). Kemp's brief says nothing about the charging information or what was actually charged. Assuming the State's representation about the charged offense is correct, it seems most likely that the statutes under which Kemp was charged were 63 O.S. 2001, § 2–509(A) and (B) and 21 O.S.Supp.2002, § 51.1.

motion to suppress based on its finding that Kemp's consent to search his property was not voluntary. Under the circumstances of this case, we find that the district court properly granted the motion. We therefore affirm the district court's suppression order.

### FACTS

¶ 3 On July 16, 2007, law enforcement officers received a report of a man shooting a firearm at employees of the Choctaw Electric Company from outside Kemp's rural residence. The employees gave officers a description of the man firing the shots and a description of his vehicle. At approximately 11:40 a.m., Trooper Darst of the Oklahoma Highway Patrol (OHP) telephoned Kemp's home and left a message that Kemp needed to call him. Kemp returned the call and Darst instructed Kemp to meet him at the Centerpoint Store. At approximately 12:20 p.m., Kemp and his wife drove away from their residence.

¶ 4 In Kemp's version of events, as he and his wife approached the intersection of Atoka County Line Road and Airport Road,[2] a group of 12–13 officers in military-style tactical uniforms surrounded his car with weapons pointed at them and told them to get out.[3] When Kemp got out of the car, OHP Trooper Antwine forced him to the ground, handcuffed him, and told him he was under arrest.[4] Kemp was given *Miranda* warnings. Officers also ordered Kemp's sixty-nine-year-old wife out of the car and onto the ground, but she told them she could not

comply because she had a bad knee. The officers allowed her to stay in the vehicle even though the temperature was near 100 degrees and the car's air conditioner was inoperative.[5]

¶ 5 At approximately 1:30 p.m., Trooper Darst arrived and took the handcuffs off Kemp. Darst placed Kemp in his patrol vehicle, continued to question him, and asked him to sign a consent to search his property. Kemp refused. Trooper Darst continued to talk to Kemp and, according to Kemp, Darst asked him twice more to sign the consent form. Kemp claimed he refused both additional requests.

¶ 6 Kemp testified that while he sat in Trooper Darst's vehicle armed officers milled around outside the vehicle. Additionally, despite being uncuffed, Kemp was never told that he was free to leave.[6] Kemp also testified that during this time he was in considerable pain. The pain stemmed from his initial contact with Trooper Antwine who, he claimed, had kneed him in the back to cause him to spread out on the ground. According to Kemp, he had titanium pins in his lower back and Trooper Antwine's knee hit him in that spot chipping a bone.

¶ 7 Kemp testified further that he could see his wife from his position inside Trooper Darst's vehicle and that he could tell she was having difficulty breathing in the heat. At one point, just prior to giving consent, Kemp saw his wife slump over in their car and at the same time saw an OHP Trooper rush to

2. The gravel road intersection was approximately one mile from Kemp's property.

3. Deputy Amiott testified that five or six OHP Tactical Team members wearing armor and carrying automatic weapons were at the scene. He testified further that Troopers Darst, Antwine, and Walker were also present along with Deputies McCool and McGinty and some unnamed probation and parole officers.

4. Trooper Antwine denied telling Kemp he was under arrest. According to Trooper Antwine, Kemp was merely being "detained" at this point. Nevertheless, Trooper Antwine agreed that the handcuffed Kemp was not free to leave while they waited for Trooper Darst.

5. Kemp's wife testified that she was in the hot car at that location for over four hours. She also testified that toward the end of the encounter she

was about to pass out because the heat, her asthma, and her heart condition were making it difficult to breathe. She stated that she was never placed under arrest, but nevertheless did not feel free to leave because when she asked to move the car down the road slightly to park it in the shade, the officer told her: "[N]o. Pull your car around on Airport Road and stay in it" (Tr. 79). Kemp's wife signed a consent to search at approximately 4:00 p.m.

6. Trooper Darst testified that Kemp was "free to go as far as I was concerned," but stated that he never told him so (Tr. 54). Trooper Darst testified further that even though Kemp was free to leave, he "stayed in my truck [and] I sat in the truck with him" (Tr. 55).

the car saying "she fainted" (Tr. 165–167). Kemp knew his wife had a heart condition and asthma. Knowing this, Kemp was of the opinion that she was "in dire need" of her asthma medication and nebulizer[7] (Tr. 150–151, 170–171).

¶ 8 According to Kemp, it was fear for his wife's safety and hope that she would get her medications that ultimately caused him to sign the consent to search. Kemp testified that he told Trooper Darst and Atoka County Deputy Sheriff Amiott twice that he was agreeing to the search so that his wife could get her medicine. Trooper Darst testified he did not recall Kemp mentioning anything about his wife needing medication. Deputy Amiott similarly failed to recall Kemp mentioning anything about his wife's need for medication. In Trooper Darst's version of events, Kemp signed the consent form because "he knew we were going to get a search warrant" (Tr. 55).[8] Kemp signed the consent to search form at 4:09 p.m.

¶ 9 After signing the consent form, Kemp accompanied officers back to his home and told them where marihuana was growing. He was then taken to the Atoka County Sheriff's Office, where he told officers that the marihuana plants were his and he was responsible for growing them.

¶ 10 Kemp moved the district court to suppress the evidence seized in the search of his property on the grounds that his consent to search was not given freely and voluntarily. Based on testimony and evidence presented at a combined preliminary and suppression hearing, the district court granted Kemp's motion to suppress.

### DISCUSSION

¶ 11 The State claims that the district court improperly granted Kemp's motion to suppress evidence. According to the State, the district court's decision was based on an erroneous conclusion that Kemp's consent to

search was not voluntary because that conclusion rested on an incorrect finding that Kemp had been detained by police for the three-hour period preceding the consent.

¶ 12 When reviewing a trial court's ruling on a motion to suppress evidence based on an allegedly illegal search, we defer to the trial court's factual findings unless those findings are clearly erroneous. *Gomez v. State,* 2007 OK CR 33, ¶ 5, 168 P.3d 1139, 1141–1142; *Seabolt v. State,* 2006 OK CR 50, ¶ 5, 152 P.3d 235, 237. Unless the findings below have no support in the record, this Court will not disturb the ruling on appeal. *State v. Kudron,* 1991 OK CR 92, ¶ 19, 816 P.2d 567, 570–571. Here, there is more than just some support for the district court's findings.

¶ 13 Kemp's testimony and the testimony of officers were in agreement that he was stopped and handcuffed at a roadside location some distance from his home. The testimony is also consistent among the various witnesses that at some point the handcuffs were removed but Kemp remained in a police vehicle for at least three hours and then, after being advised that officers would get a search warrant, consented to a search of his property.

¶ 14 Kemp testified that, after being told he was under arrest, he was never told he was free to go. Trooper Darst also testified that Kemp was never told he was free to leave. Further, Kemp stated that during the time he was with officers, he refused three times to consent to a search of his property.[9] Additionally, Kemp's testimony and the testimony of officers showed that there were as many as thirteen officers at the scene of the roadside encounter. Kemp, his wife, Trooper Darst and Deputy Amiott all testified that a number of officers at the scene were dressed in military-style tactical uniforms, wore body armor, and carried automatic and semiautomatic weapons. Kemp and his wife both

---

7. A nebulizer is a device for administering a medication by spraying a fine mist into the nose. It is also known as an atomizer.

8. Trooper Darst told Kemp that police would get a search warrant if he did not consent to a search.

9. Trooper Darst testified that the first time he asked Kemp for consent to search, he refused, but the second time he agreed. Thus, according to Trooper Darst's testimony, Kemp only refused to consent one time.

testified that at the beginning of the encounter officers pointed their weapons directly at them.

¶ 15 Under these circumstances, it is not likely that a reasonable person having been forcibly detained, placed in a police car surrounded by a heavily armed contingent of police, and told nothing about being free to go, would feel free to get out of the police car and walk away. This evidence was sufficient for the district court to conclude that Kemp was "detained" by police when he consented to the search of his property. *See Coffia v. State*, 2008 OK CR 24, ¶ 14, 191 P.3d 594, 598 ("To determine whether an encounter was consensual, courts consider if a reasonable person would have felt free to leave considering the totality of the circumstances. A consensual encounter is the voluntary cooperation of a private citizen in response to noncoercive questioning by a law enforcement officer") (internal quotation marks omitted); *Skelly v. State*, 1994 OK CR 55, ¶ 12, 880 P.2d 401, 405 ("[s]eizure of a person occurs within the meaning of the Fourth Amendment when, in light of all the attendant circumstances, a reasonable person would have believed he was not free to leave").

¶ 16 Nevertheless, as the State correctly points out, consent to search is not necessarily involuntary simply because it is given while in custody. *United States v. Watson*, 423 U.S. 411, 424, 96 S.Ct. 820, 828, 46 L.Ed.2d 598 (1976) ("the fact of custody alone has never been enough in itself to demonstrate a coerced confession or consent to search"). The State argues, therefore, that the district court's findings that the length of the detention, the number of police officers assembled at the scene, their manner of dress and their display of automatic and semi-automatic weaponry, were not sufficient to negate the voluntariness of Kemp's consent, even if he were in custody. In making this argument, the State starts from a position that consent is presumed voluntary unless proved otherwise. This conclusion is contrary to well settled precedent of this Court.

¶ 17 Both this Court and the Supreme Court have consistently held that when the voluntariness of consent to search is at issue, it is the State's burden to show by clear and convincing evidence that the consent was voluntary. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 249, 93 S.Ct. 2041, 2059, 36 L.Ed.2d 854 ("[w]e hold only that when the subject of a search is not in custody and the State attempts to justify a search on the basis of his consent, the Fourth and Fourteenth Amendments require that it demonstrate that the consent was in fact voluntarily given, and not the result of duress or coercion, express or implied"); *Burton v. State*, 2009 OK CR 10, ¶ 14, 204 P.3d 772, 776 ("[w]here the State claims consent as an exception to the warrant requirement, the proof offered by the State must be clear and convincing that the waiver was a free and voluntary act"); *Coon v. State*, 1978 OK CR 131, ¶ 8, 587 P.2d 1373, 1374 ("burden of proof is on the State to prove by clear and convincing evidence that the consent to search was free[ly] and voluntarily given").

¶ 18 Here, Kemp's testimony as well as the testimony of Officer Darst showed that Kemp explicitly refused to consent to a search of his property at least once and possibly three times before he finally gave in. Additionally, Kemp testified that: (1) he was in pain from being forced to the ground by Trooper Antwine during the initial arrest; and (2) as time passed he saw his sixty-nine-year-old asthmatic wife, who also had a heart condition, breathing with increasing difficulty as she sat nearby in their unshaded unairconditioned car in the 100–degree heat without her medication. Given these circumstances, as well as the show of force by police, the length of the detention, and the isolated highway location at which the encounter occurred, we cannot find the evidence before the district court clear and convincing that Kemp freely and voluntarily consented to the search. Because the State failed to meet its burden of proof, the district court properly granted the suppression motion.[10]

10.  It is not possible to determine from either the district court's order granting the suppression motion (O.R. 45–46), or Kemp's suppression motion itself (O.R. 22–23), or the transcript of the combined preliminary-suppression hearing, just what evidence was ordered suppressed. We assume that the evidence at issue consists solely of

## DECISION

¶ 19 The Order of the District Court granting Kemp's Motion to Suppress is **AFFIRMED.** Pursuant to Rule 3.15, *Rules of the Oklahoma Court of Criminal Appeals,* Title 22, Ch. 18, App. (2009), the **MANDATE** is **ORDERED** issued upon delivery and filing of this decision.

C. JOHNSON, P.J., LUMPKIN, J. and LEWIS, J.: concur.

CHAPEL, J.: concur in results.

evidence of the thirty-nine marihuana plants

found on Kemp's property.