STATE v. STRAWN



 

 
 
 
 
 
 Skip to Main Content
 Accessibility Statement
 
 
 
 
 
 Help
 Contact Us
 
 
 
 
 e-payments
 Careers
 
 
 
 
 
 
 
 
 
 
 
 Home
 Courts
 Decisions
 Programs
 News
 Legal Research
 Court Records
 Quick Links
 
 
 
 
 
 OSCN Found Document:STATE v. STRAWN

 

 
 



 
 
 
 
 Previous Case

 
 Top Of Index

 
 This Point in Index

 
 Citationize

 
 Next Case

 
 Print Only
 
 
 

 
 STATE v. STRAWN
2018 OK CR 2
Case Number: S-2016-963
Decided: 02/08/2018
STATE OF OKLAHOMA, Appellant, v. KELLY STRAWN, Appellee.
Cite as: 2018 OK CR 2, __ __

 

 

O P I N I O N

HUDSON, JUDGE:

¶1 On February 25, 2016, Appellee Kelly Strawn, was charged with Count 1: Unlawful Possession of Controlled Drug With Intent to Distribute, in violation of 63 O.S.Supp.2012, § 2-401(B)(2); and Count 2: Driving with a Cancelled, Suspended or Revoked License, in violation of 47 O.S.2011, § 6-303(B), in the District Court of Okmulgee County, Case No. CF-2016-75. Strawn was bound over at preliminary hearing on the felony charge. Strawn thereafter filed a motion to suppress all narcotics evidence arising from the traffic stop of his vehicle. District court arraignment was held August 5, 2016. Strawn then filed supplemental authority with the district court in support of his motion to suppress. On October 7, 2016, a hearing was held on Strawn's motion to suppress. At the conclusion of this hearing, the Honorable Kenneth E. Adair, District Judge, granted the motion to suppress and, upon the State's oral notice of its intent to appeal, stayed further proceedings in the case.

¶2 Appellant, the State of Oklahoma, now appeals. We exercise jurisdiction pursuant to 22 O.S.2011, § 1053(5). For the reasons discussed below, we reverse the district court's ruling and remand for further proceedings.

BACKGROUND

¶3 Both the district court and the parties relied largely upon the transcript of the preliminary hearing testimony in litigating the motion to suppress below. What follows is a summary of testimony from Oklahoma Highway Patrol (OHP) Trooper Daren Koch, the sole witness presented at that hearing. Trooper Koch, a seventeen (17) year OHP veteran, described for the court his training and education in relation to narcotics interdiction and certified drug K-9 handling. Trooper Koch also discussed his drug dog and the certifications they hold as a team for drug detection. Trooper Koch then turned to the events in the present case.

¶4 On February 16, 2016, Trooper Koch initiated a stop of a truck driven by the defendant, Kelly Strawn, on Interstate 40 near Mile Marker 242 in Okmulgee County. Strawn was stopped for speeding, specifically, driving 73 miles per hour in a 70 mile-per-hour zone. Trooper Koch made contact with Strawn at the truck's driver-side window, informed him of the violation and asked for a driver's license. Trooper Koch then instructed Strawn to come back to the patrol unit so Trooper Koch could write him a warning. Trooper Koch noticed that Strawn's hand was shaking and that he had two large dogs inside his truck. Strawn complied. Once both men were seated in the front of the patrol unit, Trooper Koch started running Strawn's license and vehicle registration and began writing out the warning.

¶5 During his brief conversation with Strawn while sitting in the patrol unit, Strawn said he was from Northern California and was driving to Memphis to see a girl. Trooper Koch, based upon his training and experience as a narcotics interdiction officer, recognized Northern California as "a hotspot" for the origin of narcotics, particularly high-grade marijuana. When Trooper Koch inquired about Strawn's destination, Strawn paused before saying he was going to Memphis to see a girl. Trooper Koch "thought possibly this pause that he had in his speech was a sign of deception."

¶6 Strawn also repeatedly engaged in what Trooper Koch described as a "fake yawning[.]" Trooper Koch estimated that Strawn "fake yawn[ed]" at least six or seven times during the course of his contact with Strawn in the front of the patrol unit. Based on his training, Trooper Koch testified that he recognized Strawn's "fake yawning" as an indicator of nervousness. Trooper Koch is trained to pay attention to body language and, based upon his training and experience, he determined the fake yawns were "nervousness that was leaking from [Strawn's] body."

¶7 When Trooper Koch ran Strawn's driver's license, he discovered it was suspended in California and was not valid. Continuing the conversation, Trooper Koch asked Strawn what he did for a living. Strawn paused, then responded that he cut wood. Trooper Koch believed this was possibly another deceptive answer. In addition, Trooper Koch observed other signs of nervousness by Strawn. For example, Strawn's carotid artery was visible in his neck and Trooper Koch observed that it was "beating heavily, rapidly." Trooper Koch noticed too that Strawn, in addition to the yawning, was "making weird movements with his mouth." Trooper Koch testified that he also could see Strawn's heart beating through both his chest and shirt.

¶8 At this point, Trooper Koch thought Strawn "maybe . . . was tweaking. It looked like he was on meth." Trooper Koch recognized Strawn as being "extremely nervous." Strawn's behavior was well outside the norm of what he had observed in similar situations where he had written warnings to motorists whose only offense was speeding. At this point, Trooper Koch believed that he had reasonable suspicion that criminal activity was afoot. Trooper Koch asked Strawn about his license being suspended. Strawn admitted knowing his driver's license was suspended; Strawn said it was suspended for not having insurance.

¶9 Trooper Koch printed out the written warning for the speeding violation and gave it to Strawn along with his license and other documents. Trooper Koch then explained the warning and told Strawn he could not drive away due to the suspended license. Trooper Koch testified that, at this point, "most people are gonna say thank you. They'll get out" but Strawn did not exit the patrol unit. Instead, Strawn remain seated in the vehicle.

¶10 Trooper Koch testified that he "entered into a consentual [sic] encounter" with Strawn at that moment. Trooper Koch asked whether Strawn was transporting anything illegal such as an open container of alcohol, weapons or drugs of any kind. In response, Strawn "basically just sat there and looked at his truck" and did not answer. Strawn was "[j]ust . . . locked up. He would look at me, then look at his truck, look at me, look at his truck." Strawn looked at Trooper Koch and "didn't know what to say." Trooper Koch recognized this as more nervousness on Strawn's part and told him: "you can say yes or no." Strawn abruptly responded "no."

¶11 Trooper Koch then told Strawn he was going to run his K-9 unit around the truck. Trooper Koch explained the four odors to which his drug dog alerted and asked Strawn whether there was any reason his dog would alert on his truck. Strawn responded that there were "crumbles of pot" all over his truck. Strawn then confirmed that by "pot" he meant marijuana. Trooper Koch told Strawn that, based on that information, he now had probable cause to search the truck and intended to search the vehicle. Trooper Koch asked Strawn whether he had anything else in the truck, and, specifically, whether he "had any pounds." Strawn did not answer but instead merely looked at his truck.

¶12 Trooper Koch next placed Strawn in handcuffs and asked again whether he, Strawn, had "any pounds" in the truck. Strawn replied "a couple" behind the backseat. Trooper Koch had Strawn (while handcuffed) leash and remove the two large dogs from his truck. Trooper Koch then searched the truck and found five (5) large vacuum-sealed bags of high grade marijuana weighing 1.06 pounds each.

¶13 On cross-examination, Trooper Koch acknowledged that when he handed the written warning to Strawn, he did not tell Strawn he was free to go. Instead, Trooper Koch told Strawn he could not drive away. When defense counsel suggested that Strawn sat in the patrol unit because he had no other place to go, Trooper Koch responded "[h]e could step out and hang out on the shoulder." Trooper Koch further acknowledged that he started talking to Strawn about the other things a few seconds after telling Strawn he could not drive away.

¶14 Strawn's written motion to suppress alleged that Trooper Koch unlawfully prolonged the traffic stop without reasonable suspicion beyond the time needed to address the traffic violation that warranted the stop (speeding) and the traffic violation which subsequently arose during the stop (the cancelled or suspended driver's license). Strawn argued there was no consensual encounter leading to the search. Strawn too complained that the trooper's stated reliance upon his nervousness was insufficient to establish reasonable suspicion of criminal activity. Strawn argued that nervousness alone is insufficient to warrant prolonging a traffic stop to investigate perceived criminal activity. Further, Strawn reasoned, the video of the traffic stop did not show "extreme nervousness" as Trooper Koch claimed. Finally, none of the other factors cited by the trooper--Strawn being from Northern California, his work cutting wood or his stated destination of Memphis and his reason for going--supplied reasonable suspicion under the totality of circumstances to prolong the traffic stop for further investigation after writing the warning.

¶15 The State did not file a written response to Strawn's motion to suppress. At the hearing on the motion to suppress, defense counsel offered as an exhibit the video of the traffic stop recorded from Trooper Koch's patrol unit. Judge Adair admitted the video as an exhibit but did not view it at the hearing because he did not have a device on which to play the CD-ROM video. The video of the stop is part of the record before this Court on appeal.

¶16 Defense counsel then called Strawn as a witness to explain the "fake yawning" described by Trooper Koch in his preliminary hearing testimony. Strawn testified that he opened his mouth several times, as shown on the video of the traffic stop, due to "pressure in [his] ears." Strawn testified that the pressure in his ears is an ongoing problem for him and that he opened his mouth several times while sitting in Trooper Koch's patrol unit "[t]o try to clear the pressure out of [his] ears." Strawn testified that the trooper's "diagnosis" of "fake yawning" was thus an inaccurate "medical diagnosis." The prosecutor did not cross-examine Strawn.

¶17 Defense counsel stood on the argument contained in his written motion. After questioning both defense counsel and the State, Judge Adair granted the motion to quash. This appeal ensued.

ANALYSIS

¶18 The State brings this appeal under 22 O.S.2011, § 1053(5) and challenges the district court's order granting the defense motion to suppress. Section 1053(5) provides that the State may appeal "[u]pon a pretrial order, decision, or judgment suppressing or excluding evidence where appellate review of the issue would be in the best interests of justice[.]" We find that the best interests of justice warrant review of the State's appeal because the suppressed evidence forms a substantial part of the State's evidence. Thus, the State's ability to prosecute Strawn on the Count 1 felony drug charge is substantially impaired absent the suppressed evidence and our review here is appropriate. Feeken v. State, 2016 OK CR 6, ¶ 1 n.1, 371 P.3d 1124, 1125 n.1; State v. Iven, 2014 OK CR 8, ¶ 6, 335 P.3d 264, 267.

¶19 "When reviewing a trial court's ruling on a motion to suppress evidence based on a complaint of an illegal search and seizure, this Court defers to the trial court's findings of fact unless they are not supported by competent evidence and are therefore clearly erroneous. We review the trial court's legal conclusions based on those facts de novo." State v. Alba, 2015 OK CR 2, ¶ 4, 341 P.3d 91, 92 (internal citations omitted).

¶20 The State argues on appeal, as it did below, that Trooper Koch had reasonable suspicion based upon the totality of circumstances to continue questioning Strawn after he handed Strawn the printed warning and told him he could not drive away because of the suspended driver's license. The State argues too that Trooper Koch engaged in a consensual encounter with Strawn from this point on and, alternatively, that the inevitable discovery doctrine applies to save the drug evidence in this case.

¶21 Appellee had a right under both the United States and Oklahoma constitutions to be free from unreasonable searches and seizures. Alba, 2015 OK CR 2, ¶ 5, 341 P.3d at 92 (citing U.S. Const. amend. IV; Okla. Const. art. 2, § 30). As we have held:

A traffic stop is a seizure under the Fourth Amendment. McGaughey v. State, 2001 OK CR 33, ¶ 24, 37 P.3d 130, 136. The scope and duration of such a seizure must be related to the stop and must last no longer than is necessary to effectuate the stop's purpose. Florida v. Royer, 460 U.S. 491, 500, 103 S. Ct. 1319, 1325, 75 L. Ed. 2d 229 (1983); Terry v. Ohio, 392 U.S. 1, 20, 88 S. Ct. 1868, 1879, 20 L. Ed. 2d 889 (1968); McGaughey, 2001 OK CR 33, ¶¶ 24 and 27, 37 P.3d at 136-37. If the length of the investigative detention goes beyond the time necessary to reasonably effectuate the reason for the stop, the Fourth Amendment requires reasonable suspicion that the person stopped has committed, is committing or is about to commit a crime.

Seabolt v. State, 2006 OK CR 50, ¶ 6, 152 P.3d 235, 237-38.

¶22 Here, the record shows Trooper Koch witnessed a traffic violation by Strawn, specifically, driving three miles per hour over the posted speed limit on an interstate highway, a violation of 47 O.S.Supp.2015, § 11-801. Strawn's counsel stipulated at the hearing on the motion to suppress that this was a lawful stop. Because he had probable cause to believe that a traffic violation had occurred, Trooper Koch's decision to stop the vehicle driven by Strawn was wholly reasonable. Whren v. United States, 517 U.S. 806, 809-10, 116 S. Ct. 1769, 1772, 135 L. Ed. 2d 89 (1996); Dufries v. State, 2006 OK CR 13, ¶ 8, 133 P.3d 887, 889. This is so regardless of the officer's subjective motivation for the stop. Id., 2006 OK CR 13, ¶ 9, 133 P.3d at 889 ("Subjective intentions play no role in the ordinary probable-cause Fourth Amendment analysis.").

¶23 Although Trooper Koch's stop of Strawn for speeding was lawful, that does not mean that the duration of the stop was lawful. "[A] police stop exceeding the time needed to handle the matter for which the stop was made violates the Constitution's shield against unreasonable seizures." Rodriguez v. United States, 575 U.S.__, 135 S. Ct. 1609, 1612, 191 L. Ed. 2d 492 (2015). In this sense, "the tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'--to address the traffic violation that warranted the stop and attend to related safety concerns." Id., 135 S. Ct. at 1614 (internal citations omitted). "Authority for the seizure thus ends when tasks tied to the traffic infraction are--or reasonably should have been--completed." Id.

¶24 The United States Supreme Court has recognized that, in addition to issuing a traffic citation, "an officer's mission includes 'ordinary inquiries incident to [the traffic] stop'" like "checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." Id., 135 S. Ct. at 1615 (quoting Illinois v. Caballes, 543 U.S. 405, 408, 125 S. Ct. 834, 837, 160 L. Ed. 2d 842 (2005)). Unlike a dog sniff, which is a measure aimed at detecting criminal wrongdoing, the ordinary inquiries incident to a traffic stop are aimed at ensuring that vehicles on the road are operated in a safe and responsible manner. Id. Investigations and actions unrelated to the traffic stop--like questioning and a dog sniff--which do not lengthen the roadside detention are permissible under the Fourth Amendment. Id., 135 S. Ct. at 1614. In this sense, an officer "may conduct certain unrelated checks during an otherwise lawful traffic stop. But . . . he may not do so in a way that prolongs the stop, absent the reasonable suspicion ordinarily demanded to justify detaining an individual." Id., 135 S. Ct. at 1615.

¶25 In the present case, the record shows Trooper Koch completed his enforcement action by returning Strawn's documents and license and issuing him a written warning. Trooper Koch explained the warning and also told Strawn that he could not drive away in his truck due to the suspended driver's license. At this point, all tasks associated with the mission of the traffic stop were completed. However, the record confirms Strawn simply sat in Trooper Koch's patrol unit and did not get out. Trooper Koch described the questioning that occurred next--along with Strawn's answers leading to his admission that there was marijuana in his truck--as a consensual encounter with Strawn. If this was a consensual encounter, Trooper Koch's subsequent questioning of Strawn did not violate the Fourth Amendment and Strawn's statement that there was marijuana in his truck provided probable cause to search the vehicle.

¶26 The district court did not specifically address this issue, instead focusing on whether Trooper Koch had reasonable articulable suspicion of other crimes to justify prolonging the traffic stop for further investigation. Essentially, we have a ruling from the trial court, without any independent factual findings, that Trooper Koch's questioning after handing the warning and other paperwork back to Strawn was an illegal seizure. The district court with this ruling nonetheless implicitly rejected Trooper Koch's testimony that a consensual encounter arose after he handed Strawn the warning and related paperwork. Because the district court did not expressly address this issue, we turn to the evidence presented at the preliminary hearing "and consider whether it fairly supports the ruling under relevant legal principles." Feeken, 2016 OK CR 6, ¶ 3, 371 P.3d at 1125.

¶27 Consensual encounters are not Fourth Amendment seizures since they involve the mere voluntary cooperation with an officer's non-coercive questioning. In the context of traffic stops, we have held:

The police may detain a driver longer than necessary for the initial stop with consent. See State v. Goins, 2004 OK CR 5, ¶ 17, 84 P.3d 767, 770. A driver must be permitted to proceed after a routine traffic stop if a license and registration check reveals no reason to detain the driver unless the officer has reasonable articulable suspicion of other crimes or the driver voluntarily consents. See id. at ¶ 13, 84 P.3d at 770. To determine whether an encounter was consensual, courts consider if a reasonable person would have felt free to leave considering the totality of the circumstances. Id. at ¶ 18, 84 P.3d at 770. A "consensual encounter is the voluntary cooperation of a private citizen in response to non-coercive questioning by a law enforcement officer." Id. at ¶ 20, 84 P.3d at 771 quoting United States v. West, 219 F.3d 1171, 1176 (10th Cir. 2000). Applying this test, a "traffic stop may become a consensual encounter, requiring no reasonable suspicion, if the officer returns the license and registration and asks questions without further constraining the driver by an overbearing show of authority." Id.

Coffia v. State, 2008 OK CR 24, ¶ 14, 191 P.3d 594, 598.

¶28 In the present case, the mere fact that Strawn was sitting in Trooper Koch's patrol unit after being handed back his license and paperwork, without more, does not make his subsequent questioning involuntary. United States v. Bradford, 423 F.3d 1149, 1158 (10th Cir. 2005). The same is true of the fact that Strawn was not informed at that moment that he was free to leave. Goins, 2004 OK CR 5, ¶ 20, 84 P.3d at 770 ("An officer is not required to inform a suspect that he did not have to respond to his questioning or that he was free to leave. Therefore, an unlawful detention occurs only when the driver has an 'objective reason to believe he or she is not free to end the conversation with the officer and proceed on his or her own way.'") (quoting West, 219 F.3d at 1176-77).

¶29 Our review of the testimony, along with the video of the traffic stop, convinces us that a consensual encounter occurred when Trooper Koch handed the driver's license and paperwork back to Strawn, told him that he could not legally drive away and then asked whether there was anything illegal in the truck. Indeed, the video from inside Trooper Koch's patrol unit leaves no doubt that a consensual encounter occurred. Initially, we note that the entire conversation between Trooper Koch and Strawn inside the patrol unit, as shown on the video, is fairly described as conversational and relaxed. Even when Strawn is asked about not having a license, Trooper Koch is not confrontational but instead merely inquisitive as to why and informative concerning the need for Strawn to drive with a license.

¶30 The placid nature of the encounter between Trooper Koch and Strawn is evident throughout the entire stop. Trooper Koch at one point can be heard asking Strawn about the type of dogs he has in the car and whether he had considered moving somewhere in the area to be closer to his girlfriend in Memphis. The conversation too occurs intermittently while Trooper Koch is working on the warning. We note that Trooper Koch moves quickly in writing the warning and running Strawn's information through the on-board computer. The total encounter from the moment Strawn sits down in Trooper Koch's patrol unit to the time Trooper Koch hands back Strawn's license and begins discussing the warning amounts to roughly five (5) minutes.

¶31 At the conclusion of the enforcement action, the video shows that Trooper Koch told Strawn that he did not cite him for driving without a license. However, Trooper Koch told Strawn that he needs to "get that squared away." The video shows that Trooper Koch also informed Strawn that "legally you can't drive, so I can't let you drive off from here, okay, so you need to figure out something to get where you're going. Okie-doke." Strawn repeatedly nods, responds "okay" to the trooper and can be seen looking down at the paperwork he was just handed.

¶32 At this point, a reasonable person would have felt free to leave Trooper Koch's patrol unit. Trooper Koch's actions and words conveyed to Strawn that the enforcement action was completed. Trooper Koch returned Strawn's documents along with the written warning and explained that he did not write a ticket for Strawn driving without a license. Although Trooper Koch explained that Strawn could not drive away because of his failure to have a valid driver's license, and that Strawn needed to figure out some way "to figure out something to get where you're going[,]" there was no impediment to Strawn exiting the vehicle. Indeed, Trooper Koch concluded his enforcement action for the traffic violation with the parting phrase "Okie-doke" further indicating the conclusion of the encounter. Trooper Koch's subsequent questions to Strawn whether he had anything illegal in his truck, whether he would give permission to search the truck and whether his drug dog would alert on anything inside the truck, was stated matter-of-factly and, again, not in an accusatory or overbearing manner.

¶33 These facts, combined with the overall speed and non-confrontational nature of the encounter between Trooper Koch and Strawn inside the patrol unit convince us that the subsequent questioning of Strawn amounted to a consensual encounter. There was no restraining of Strawn by an overbearing show of authority. Nor was there evidence that Trooper Koch used a commanding or threatening manner or tone of voice, displayed a weapon or otherwise touched Strawn. Also, nothing in Trooper Koch's manner or words were accusatory, persistent or intrusive. Nor did they suggest that compliance was necessary. See Goins, 2004 OK CR 5, ¶¶ 17-18, 84 P.3d at 770-71 (discussing factors utilized in determining whether a police encounter is consensual). Under the total circumstances, a reasonable person would feel free to leave the patrol unit and proceed on his or her own way.

¶34 The district court's recurring concerns that Trooper Koch's actions in connection with this stop were a mere pretext to conducting a search of Strawn's truck does not undermine Trooper Koch's testimony that a consensual encounter arose. Again, Trooper Koch had probable cause to believe that a traffic violation had occurred. Thus, his decision to stop Strawn's vehicle was wholly reasonable regardless of his subjective motivation for the stop. Whren, 517 U.S. at 809-10, 116 S. Ct. at 1772; Dufries, 2006 OK CR 13, ¶ 8, 133 P.3d at 889. The same is true of the trooper's decision to continue questioning Strawn in connection with what the record--in particular the video of the stop itself--shows objectively was a consensual encounter. "This Court has never held that an officer must have a reasonable and articulable suspicion before he may ask for consent after he has already engaged in a valid traffic stop. We have only held that consent must be voluntary." Goins, 2004 OK CR 5, ¶ 20, 84 P.3d at 771.

¶35 We therefore reverse the district court's order granting Strawn's motion to suppress and remand this case for further proceedings. We do not address in this opinion the district court's apparent conclusion that Trooper Koch did not have reasonable suspicion of ongoing criminal activity to prolong the stop with additional questioning in light of the above findings. Our finding of a consensual encounter resolves Strawn's Fourth Amendment challenge to the narcotics evidence in this case. Simply, the Fourth Amendment presents no impediment whatsoever to the admission of this evidence at Strawn's trial.

DECISION

¶36 The District Court's order sustaining Appellee's motion to suppress is REVERSED and this case is REMANDED for further proceedings not inconsistent with this Opinion. Pursuant to Rule 3.15, Rules of the Oklahoma Court of Criminal Appeals, Title 22, Ch.18, App. (2018), the MANDATE is ORDERED issued upon the delivery and filing of this decision.

AN APPEAL FROM THE DISTRICT COURT OF OKMULGEE COUNTY
THE HONORABLE KENNETH E. ADAIR, DISTRICT JUDGE

 

 
 
 
 APPEARANCES AT HEARING
 
 
 APPEARANCES ON APPEAL
 
 
 
 
 CAROL ISKI
 FIRST ASSISTANT DISTRICT ATTY
 314 WEST 7th STREET
 OKMULGEE, OK 74447
 COUNSEL FOR THE STATE

 JAY K. RAMEY
 1408 SOUTH DENVER AVENUE
 TULSA, OK 74119
 COUNSEL FOR DEFENDANT
 
 
 CAROL ISKI
 FIRST ASSISTANT DISTRICT ATTY
 314 WEST 7TH STREET
 OKMULGEE, OK 74447
 COUNSEL FOR APPELLANT
 
 JAY K. RAMEY
 1408 SOUTH DENVER AVENUE
 TULSA, OK 74119
 COUNSEL FOR APPELLEE
 
 
 

 

OPINION BY: HUDSON, J.
LUMPKIN, P.J.: CONCUR
LEWIS, V.P.J.: CONCUR
KUEHN, J.: CONCUR
ROWLAND, J.: CONCUR

 






 Citationizer© Summary of Documents Citing This Document
 
 
 
 Cite
 Name
 Level
 
 
 
 None Found.
 
 
 Citationizer: Table of Authority
 
 
 
 Cite
 Name
 Level
 
 
 
 Oklahoma Court of Criminal Appeals Cases
 Cite
Name
Level

 2001 OK CR 33, 37 P.3d 130, 72 OBJ 3431, MCGAUGHEY v. STATE
Discussed at Length
 2004 OK CR 5, 84 P.3d 767, STATE v. GOINS
Discussed at Length
 2006 OK CR 13, 133 P.3d 887, DUFRIES v. STATE
Discussed at Length
 2006 OK CR 50, 152 P.3d 235, SEABOLT v. STATE
Discussed
 2008 OK CR 24, 191 P.3d 594, COFFIA v. STATE
Discussed
 2014 OK CR 8, 335 P.3d 264, STATE v. IVEN
Discussed
 2015 OK CR 2, 341 P.3d 91, STATE v. ALBA
Discussed at Length
 2016 OK CR 6, 371 P.3d 1124, STATE v. FEEKEN
Discussed at Length
Title 22. Criminal Procedure
 Cite
Name
Level

 22 O.S. 1053, State or Municipality May Appeal in What Cases
Discussed
Title 47. Motor Vehicles
 Cite
Name
Level

 47 O.S. 11-801, Basic Rule - Maximum Limits - Fines and Penalties
Cited
 47 O.S. 6-303, Driving While License Under Suspension or Revocation - Penalties - Motorcycles
Cited
Title 63. Public Health and Safety
 Cite
Name
Level

 63 O.S. 2-401, Prohibited Acts A - Penalties
Cited


 
 








 
 
 
 

 
 

 
 
 
 oscn
 
 EMAIL: webmaster@oscn.net
 Oklahoma Judicial Center
 2100 N Lincoln Blvd.
 Oklahoma City, OK 73105
 
 
 courts
 
 Supreme Court of Oklahoma
 Court of Criminal Appeals 
 Court of Civil Appeals
 District Courts
 
 
 
 decisions
 
 New Decisions
 Supreme Court of Oklahoma
 Court of Criminal Appeals
 Court of Civil Appeals
 
 
 
 programs
 
 The Sovereignty Symposium
 
 Alternative Dispute Resolution
 Early Settlement Mediation
 Children's Court Improvement Program (CIP)
 Judicial Nominating Commission
 Certified Courtroom Interpreters
 Certified Shorthand Reporters
 Accessibility ADA
 
 
 
 
 
 
 
 
 Contact Us
 Careers
 Accessibility ADA